844 A.2d 1197

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Harold S. LINK, Jr.

Misc. Docket AG No. 97, Sept. Term, 2002.

Court of Appeals of Maryland.

March 19, 2004.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Deputy Bar Counsel for Atty. Grievance Com'n of MD, Petitioner.

Harold S. Link, Jr., Cockeysville, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and JOHN C. ELDRIDGE (retired, specially assigned), JJ.

BELL, Chief Judge.

The Attorney Grievance Commission of Maryland, the petitioner, acting pursuant to Maryland Rule 16–751,[1] approved the filing by Bar Counsel of a Petition For Disciplinary or

---

1.  Maryland Rule 16–751 provides:
    "(a) Commencement of disciplinary or remedial action. Upon approval of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

Remedial Action charging the respondent, Harold S. Link, Jr., with violating Rule 4.4, Respect for Rights of Third Persons,[2] of the Maryland Rules of Professional Conduct ("MRPC"), as adopted by Maryland rule 16–812 and, in so doing, acting in a manner prejudicial to the administration of justice, in violation of MRPC 8.4(d).[3] We referred the case to the Honorable Robert E. Cadigan, of the Circuit Court for Baltimore County, for hearing, Rule 16–752(a),[4] and to find facts and draw conclusions of law. *See* 16–757(c).[5]

Following the hearing, at which the complainant, Wilbert Myles, the complainant's supervisor and the respondent, both for himself and in the petitioner's case, all testified, the hearing court concluded that the respondent violated the rules

---

**2.** Maryland Rule of Professional conduct 4.4 provides:

"In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that the lawyer knows violate the legal rights of such person."

**3.** MRPC 8.4(d) provides:

"It is professional misconduct for a lawyer to:
* * * *
"(d) engage in conduct that is prejudicial to the administration of justice;"
* * * *

**4.** Rule 16–752(a) provides:

"(a) Order.-Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing."

**5.** Maryland Rule 16–757(c) provides:

"(c) Findings and conclusions. The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party."

charged. Those conclusions were based on the findings of fact made by the court, after summarizing the testimony, as follows:

## "1. *The Incident of May 10, 2002*

"The Respondent's testimony (hereinafter "Link") is best summarized by his letter directed to Mr. Grossman dated July 4, 2002 introduced as Plaintiff's Exhibit 1(E).... [6]

"In addition, Link testified at the hearing that he has been a member of the Maryland Bar since 1990. He engages in a general practice working out of his home in Cockeysville. His practice emphasizes personal injury litigation. He employs no associates, paralegals or secretaries. Approximately 90% of his personal injury clients are African American. Link is Caucasian.

"In his testimony. Link alluded to 'problems' he previously encountered at the MVA in Towson when a clerk informed him he was not entitled to certain information 'because of the Privacy Act.' Following calls to one of the 'higher-ups' at MVA, Link concluded that the 'whole MVA system is imbued with violations of the Maryland Public Information Act.' He referred to another prior incident with a 'government employee' following which he asked to see the employee's supervisor. He indicates that his conversation with the supervisor 'was not friendly.'

"When Link went to the MVA office in Mondawmin on May 10, 2002 he was 'hoping' they would give him the insurance coverage information he needed but he 'wondered' if the MVA was 'persisting in its policy' of non-disclosure because of the Privacy Act. He purposely dressed causally because he wanted to see 'how ordinary people are treated.' He is 'appalled'

---

6. In that letter, consisting of approximately 5½ single spaced pages, the respondent painstakingly presents his side of the incident. The respondent's bottom line is that he did nothing wrong and, indeed, he was the model of decorum and was himself victimized. According to the respondent, the complaint was riddled with "so many blatant lies" that it was difficult to know where to start to answer it.

by the way he and others are 'treated poorly.' Link admitted that he has had 'difficulty' with other agencies. His 'standard' is not to 'back-down' but rather 'go into the mouth of the beast.' Link stated in closing argument that the MVA is a 'criminal organization' and is 'acting illegally.' He argued that 'its all about the little guy ... taking on the government ... whistle-blowing.'

"As stated in Link's July 4, 2002 letter (Plaintiff's Exhibit 1(E)), he testified that the MVA Customer Service Agent, Wilbert Myles (hereinafter 'Myles') was rude and curt. After being asked by Myles if he was an attorney and to produce identification. Link admits that he told Myles and his supervisor, Ms. Ryce, (hereinafter 'Ryce') that Myles was incompetent, didn't know the law and 'needs to be trained properly.' He admits that he called Myles 'a loathsome bureaucrat.' In his testimony, he stated Myles is 'rude, arrogant, incompetent and lazy.... He doesn't know the law ... he acted like a complete fool ... he was shouting ... like a complete idiot.' Link contends that his right to tell an employee how he is doing his job is protected by the First Amendment.

"When Myles refused to give Link his name, he admits that he said 'OK, Sparky, I've had enough of your nonsense-let me talk to your supervisor.' Link testified that 'Sparky' is a 'meaningless term ... for someone whose name you don't know ... it's a filler. I would usually say "partner." I am being condescending ... the term "sir" is a form of respect and I had absolutely none.' Link denied any knowledge that 'Sparky' has any racial connotation or is in any way racially offensive.

"Finally, Link testified that he 'calmly answered Mr. Myles' silly questions' and never raised his voice during the May 2002 encounter but rather was verbally abused by Myles. Link contends that his conduct was 'impeccable.'

"Wilbert Myles testified that he is 61 years old and has been a Customer Service Agent with MVA for nine years. He previously worked as a Senior Assistant Underwriter with USF & G for 15 years. He has had "four major surgeries"

and takes 'nine pills a day' including a 'heart pill.' Myles is an African American.

"On May 10, 2002 Link approached Myles' work station and gave him an application for a driver's record in which he had checked off 'registration records.' According to MVA policy, Myles requested Link's driver's license as identification. When asked 'why' by Link, Myles responded that without identification, he could not give Link the requested information because of the Privacy Act. Myles explained that attorneys can get a complete driver's record including name and address. Myles then inquired as to whether Link was an attorney. Link responded 'what difference does it make?' Myles offered an explanation which was in accord with his training manual. Link then stated that Myles was 'breaking the law' in not providing the information.

"Myles described Link's demeanor as 'very smug and pretentious.' Based upon Mr. Myles' 'work experience', he suspected that Link was an attorney because they 'have certain airs.'

"Myles testified that when Link continued the 'name calling . . . the maligning and the indignities that he hurled at me', Myles stated 'you need to see the supervisor.' Link stated 'you need to bring someone out here . . . because obviously you don't know what you are doing.'

"Before the supervisor (Ryce) was summonsed, Myles testified that Link called him 'Sparky' several more times. Myles took offense and protested that that was not his name and that Link's comment was demeaning, sarcastic, disrespectful and insulting. He stated that he was humiliated, upset, infuriated and embarrassed. Myles further testified that 'Sparky' is just another name for the N word for 'most people of color at my age or older.' As Myles left his work station to speak with his supervisor, he states that Link 'threw his driver's license' on the counter.

"When Myles went to his supervisor's office, she was on the telephone with customers. She placed the customer on 'hold a minute' and Myles told her 'what had happened.' When the

supervisor appeared, Myles testified that Link stated 'what took you so long?' At the point, he stated Link was 'irate' and told the supervisor that 'Sparky over here doesn't know his job' and that he should be retrained because he doesn't know the law and is incompetent. Myles states that Link told his supervisor that '. . . the system needs to hire folk who have a brain because everyone I have encountered throughout the system does not have one and they are completely incompetent.'

"Myles further testified that Link asked his supervisor for his name. She gave his last name. He then asked for his first name and she replied 'Wilbert.' Thereafter Link continued 'to yell' and proceeded to refer to Myles as Wilbert which he found to be offensive and disrespectful.

"In his supervisor's presence, Link 'proceeded to yell across the counter and pointing his finger, Wilbert, you have broken the law' and stated that he 'could be brought up on charges and that type of thing.'

"Myles admitted that he has not read the Privacy Act or the Maryland Public Information Act but states his training manual contains all relevant information.

"After hearing Myles' testimony, Link later testified that Myles was 'a liar' and that Myles was 'incredibly rude, feisty, mean' and like the 'Energizer bunny.'

"Delease Ryce has been a Customer Agent with MVA since 1988. She was Myles' supervisor at the Mondawmin office in May 2002. While she was on the telephone, Myles came to her office and told her that an attorney refused to show his identification. She had heard 'voices' but couldn't hear the conversations.

"About five to ten minutes later, she left her office and went to Myles' work station. Both Myles and Link were 'going at it'. Both were being 'rude' to each other. Their voices were not in a 'conversational' tone. She asked Myles to be quiet and 'let me handle it.'

"She believes Link asked her-'what took you so long?' She replied that she was talking on the phone with two customers. She thinks Link said 'you need to hire a competent person.' Link said 'explain to me why I had to wait ten minutes.' She replied that 'you didn't produce any identification.' She explained to Link that everyone has to show identification. She asked Link 'what kind of report do you need?' She then gave him the information he had requested. She testified that Link was not rude to her. She believes Myles was 'retaliating.' Myles only 'retaliated' when Link said something to him. It was 'back and forth' between Myles and Link.

"She stated that Link asked her for Myles' name. When she did so. Link referred to Myles as 'Wilbert.' She did not hear Link call Myles 'Sparky.' Ryce is an African American.

"The above summary of Link's testimony includes his testimony presented at the conclusion of Bar Counsel's case. In addition, Link did state that Myles was incredibly 'rude' to three customers who were in line before Link and he 'sensed' that Myles was 'going to be trouble.' He claims Myles 'demanded' Link's identification and gave Link a 'hate stare.'

Link states that Myles never told him that 'Sparky' was a racially offensive epithet. Link claims that he 'gets along with black people.'

## "2. *Findings of Facts*

"After considering the testimony presented at the hearing before this Court on July 30, 2003 and reviewing the exhibits admitted into evidence, this Court finds the following facts by clear and convincing evidence:

"1.  Link casts himself in the role or protector of the ordinary citizen. He believes his cause is just and necessary. His agenda is to expose what he perceives to be dual standards and unfair policies of governmental agencies.

"2.  This was not an isolated incident. Link had a pattern of past confrontations with agency personnel.

"3. Link pursues his agenda with design and purposely provokes controversy utilizing tactics of sarcasm, verbal abuse, offensive and disrespectful language which is not protected by the First Amendment and had no substantial purpose.

"4. Link's agenda is misguided and his conduct was unprofessional and prejudicial to the administration of justice.

"5. Link's anger needs to be controlled.

"6. Link's testimony that he never raised his voice during this incident is not credible.

"7. Myles is a public servant trying to do his job.

"8. Myles was justifiably offended and embarrassed by Link's conduct, language and attitude.

"9. Ryce's testimony raised inconsistencies in Myles' testimony. This Court accepts as credible Ryce's testimony that Myles had also raised his voice and was retaliating to Link's verbal abuse and sarcasm.

"10. Ryce is a pleasant woman and credible witness. She was acting as a 'peace-maker.'

"11. Link did not know that the name 'Sparky' was racially offensive. Link did believe he was condescending.

"The undersigned has no personal knowledge of whether the name 'Sparky' is a racial epithet or is racially offensive. The undersigned has only heard the name in reference to a World War II radioman, electrician or the baseball manager, 'Sparky' Anderson. Accordingly, the undersigned is unable to make a finding of fact in that regard.

"If indeed 'Sparky' is racially offensive, its use is obviously unprofessional, totally inappropriate and increases the seriousness and severity of the confrontation and the consequences.

"Whether 'Sparky' is offensive or innocuous in and of itself depends upon the circumstances under which it is said, who said it and to whom it is directed."

The petitioner filed no exceptions to the hearing court's findings of fact and conclusions of law. It did file, however,

Petitioner's Recommendation for Sanctions. Noting the hearing court's finding that the respondent's conduct was unprofessional and engaged in the pursuit of a "misguided" agenda, in which the respondent, casting himself as the protector of the ordinary citizen, "pursues his agenda with design and purposely provokes controversy utilizing tactics of sarcasm, verbal abuse, offensive and disrespectful language which is not protected by the First Amendment and had no substantial purpose," it recommends that the respondent be suspended from the practice of law for thirty (30) days.

In support of that recommendation, the petitioner relies on *Florida Bar v. Martocci,* 791 So.2d 1074 (Fla.2001), *Matter of Golden,* 329 S.C. 335, 496 S.E.2d 619 (1998) and *Attorney Grievance Comm'n v. Alison,* 317 Md. 523, 565 A.2d 660 (1989).

In *Martocci,* the Bar charged that Martocci made "unethical, disparaging, and profane remarks to belittle and humiliate the opposing party, Florence Berger, and her attorney ..." and engaged in an unethical confrontation with the opposing party's father.[7] 791 So.2d at 1074. The offensive conduct occurred, it alleged, in separate incidents during the representation of the husband in divorce proceedings and spanned a period of two years. *Id.* at 1075. The referee concluded that Martocci engaged in the charged conduct, which consisted of directing demeaning, insulting and intemperate remarks[8] to

---

7. The court summarized the referee's findings as this count, as follows:
   "[D]uring a recess to a hearing in the Berger proceedings, when Mr. Paton entered the courtroom, Martocci said 'here comes the father of the nut case.' Mr. Paton responded by approaching respondent and saying, 'If you have something to say to me, say it to my face, not in front of everyone here in the courtroom.' Thereafter, in open court and for all to see, Martocci closely approached Mr. Paton and threatened to beat him. Upon Ms. Figueroa's attempt to intervene, Martocci told her to 'go back to Puerto Rico.' This confrontation only ended when a bailiff entered the courtroom."
   *Florida Bar v. Martocci,* 791 So.2d 1074, 1075 (2001).

8. On several occasions, Martocci called the opposing party a "nut case" and "crazy" and, on one occasion, made "demeaning facial gestures and stuck out his tongue at" her and her lawyer. *Martocci,* 791 So.2d

the opposing party and her counsel and threatening, in open court, though court was not then in session, to beat that party's father. *Id.* The court accepted the referee's sanction recommendation, publicly reprimanding Martocci and placing him on two years probation, with conditions. *Id.*

Similarly the conduct for which the respondent attorney in *Golden* was sanctioned, was in connection with his representation of clients in divorce proceedings, specifically, at two depositions. In the first, the deposition of his client's former boyfriend, who apparently informed the husband's attorney of the former boyfriend's relationship with the wife after it was terminated on advice of Golden, Golden's examination displayed, the Hearing Panel determined, "his total disregard and failure to show any respect for the rights of a third party." 496 S.E.2d at 622. Moreover, it was satisfied that

"The extent, the intensity, the sarcasm and maliciousness, the unnecessary combativeness, the gratuitous threatening and intimidation, and the unequivocal bad manners of [Attorney's] conduct could have been for no purpose other than to embarrass or burden [Mr. Smith]."

*Id.*

The second deposition, taken in a different case, was of the wife of Golden's client. After the deposition, she alleged that Golden said to her: "You are a mean-spirited, vicious witch and I don't like your face and I don't like your voice. What I'd like, is to be locked in a room with you naked with a very sharp knife." *Id.* at 621. Later, she stated, Golden commented: "What we need for her [pointing to Mrs. Jones] is a big bag to put her in without the mouth cut out." *Id.* The hearing panel concluded that Golden, in an agitated voice and without an attempt at humor, did call Mrs. Jones "mean spirited" and state that someone should be locked in a room

at 1075. With respect to opposing counsel, Martocci was found to have called her a "stupid idiot" and to have told her that she should "go back to Puerto Rico." *Id.* In addition, the court determined that he repeatedly told her that she did not know the law or the rules of procedure and needed to return to law school. *Id.*

with her naked and that he would like to put a bag over her without a hole for her mouth. *Id.* at 622.

As to the first deposition, the court agreed that the attorney had violated South Carolina's version of Rule 4.4. It stated:

"Attorney's words speak for themselves.[9] Even if we assume that the deposition witness was uncooperative, Attorney would not be justified abusing this witness in the manner illustrated above. The record further shows that Attorney interrupted Smith on numerous occasions. Moreover, the audio recording reveals the volume of Attorney's voice was repeatedly loud, and his statements were sarcastic, rude, or otherwise inappropriate. He acted in a threatening and demeaning manner. His conduct was outrageous and completely departed from the standards of our profession, much less basic notions of human decency and civility."

The court concurred with the hearing panel's conclusion that Golden's conduct after the second deposition violated Rule 8.4(d), as it was prejudicial to the administration of

---

9. The opinion catalogues the offensive questions Golden asked the deponent. A few examples will suffice to give context to the court's comments:

"(1) [Attorney]: And who was your lawyer in your first divorce?
"[Smith]: Me.
"[Attorney]: Was that because you are cheap or you think you are smart enough to be your own lawyer? Is that what you think?
"[Smith]: What kind of a question is that?
"[Attorney]: Its a good question.
"(2) [Attorney]: I don't need criticism from you. You ain't nearly as good as I am about answering questions or asking them. Just answer my questions, mister.
* * * *
"(4) [Attorney]: You are coming across as an absolutely ridiculous person. But that's okay, you will learn the hard way.
"(5) [Attorney]: You are not smart enough to question my questions. You are not smart enough to even answer my questions. But do the best you can.
* * * *
"(10) [Attorney]: Well, I am not going to argue with you. You are not smart enough to argue with.
* * * *
"(16) Attorney referred to Smith, who had been a patient at Charter Hospital, as an "inmate" of the hospital."

justice. *Id.* at 623. Noting "the serious nature of the issues and highly charged atmosphere of the deposition," the court concluded that "Attorney's comments only served to insult an adverse party." *Id.*

The court imposed as a sanction for both counts a public reprimand.

Violations of Rules 4.4 and 8.4(d) were found and sustained in *Alison.* The Rule 4.4 violation was premised on the respondent's issuance of a subpoena to a newspaper reporter for the purpose, the hearing court found, of harassing him and preventing his reporting on the respondent's trial. 317 Md. at 539, 565 A.2d at 668. The 8.4(d) violation was premised, *inter alia,* on the behavior of the respondent toward District Court clerks. When the clerks refused, in compliance with a judge's order, to accept for filing papers tendered by the respondent post judgment, the respondent demanded, "you have to take the fucking papers," and in their presence, used other profanities, including referring to the attorney for his opponent as a "son of a bitch" and an "asshole." *Id.* at 531, 565 A.2d at 663–64. As he left the area, he said "fuck you" to the supervisor. The respondent was suspended from the practice of law for ninety days.

With respect to the Rule 4.4 violation, the Court rejected the only challenge to its inapplicability, the respondent's argument, that it did not apply due to the fact that he was not representing a client, only himself. It recognized, in connection with the Rule 8.4 violation involving the verbal abuse of the District Court clerks, that there is a difference between hurling epithets during a judicial proceeding and engaging in the same conduct outside the courtroom. 317 Md. at 536–537, 565 A.2d at 666. The Court pointed out, nevertheless, that while "[a]ttorneys are not prohibited from using profane or vulgar language at all times and under all circumstances, they are prohibited from using such language when to do so would be prejudicial to the administration of justice." *Id.* at 538, 565 A.2d at 667, citing *In re Williams,* 414 N.W.2d 394, 397 (Minn.1987).

Assuming that the respondent's words directed to the clerks were protected speech within the meaning of the First Amendment, the Court held that his speech and conduct on that occasion did not comply with the reasonable, necessary, and content-neutral restrictions imposed upon attorneys by the Maryland Rules of Professional Conduct.[10]  *Id.* at 537, 565 A.2d at 666–667.  We explained:

"We have no hesitancy in concluding that Alison's conduct in his professional dealings with the clerks was prejudicial to the administration of justice.  It is not difficult to visualize the damage to the court system and to the reputation of the legal profession that would result if attorneys were free to conduct their daily business with court clerks in the manner employed by Alison.  This court has not only the authority but the obligation to censure conduct of this kind by an attorney.  As in the case of speech within a courtroom, the restrictions are content-neutral, reasonable, necessary, and do not contravene First Amendment rights."

*Id.* at 538, 565 A.2d at 667.

The respondent filed exceptions to the findings of fact and the conclusions of law of the hearing court.[11]  To say that the respondent disagrees with the hearing court's findings of fact is to engage in understatement.  Indeed, what he thinks of the hearing court's fact finding is summarized quite early in his submission:

"2.  The blatant piece of advocacy for the Commission masquerading as a Memorandum Opinion by Judge Cadigan

---

**10.**  The Court rejected the respondent's argument that, because his speech was protected, he could not be sanctioned as a result of it, relying on *Cantwell v. Connecticut,* 310 U.S. 296, 309–10, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 1221 (1940) ("Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.") and *Chaplinsky v. New Hampshire,* 315 U.S. ·568, 571–572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

**11.**  The pleading containing the respondent's exceptions is captioned, inadvertently, we are sure, "Exceptions of Petitioner to Recommendations of the Circuit Court for Baltimore County."

is disgraceful. It goes beyond rubber-stamping and well into the realm of overt cheerleading for the Commission. It constitutes the actions of a shameless sycophant who has openly colluded with the Commission to bring about a preordained result. It is obvious that my complete testimony was disregarded by Judge Cadigan, except for those portions which could be regarded as detrimental to my case, which were ruthlessly recorded, and frequently distorted. Mr. Myles' testimony, which was riddled with inconsistencies and numerous outright lies, was treated as holy writ."

Thereafter, the respondent details at length the various deficiencies from which he believes the Memorandum Opinion suffers, characterizing them as errors, inaccuracies and intentional distortions. In addition, the respondent accuses the hearing court of abdicating its responsibility as finder of fact.

Concerning the court's conclusion that he violated Rule 4.4, the respondent maintains that the Rule either does not apply or is unconstitutionally vague. If the Rule does apply, he submits, his speech directed to Mr. Myles and in criticism of the government,[12] was protected speech, that did not disrupt the operations of a courthouse and, therefore, is not sanctiona-

---

**12.** The respondent boasts that he is prone "to criticizing government agencies, and other institutions and individuals, when I feel that they are breaking the law." Elucidating, he says:

"I do this in my own personal life, and I do it as part of my law practice. When I took my oath as an attorney, I was under the impression that it was my duty to uphold the law and to resist illegality on the part of the government, not to shill for a particular administration, political party, minority group, or politically useful group, such as government employees. I am afforded protection for my activities by the First Amendment to the United States Constitution. One of the most sacrosanct aspects of that law, and one of the battlefields on which so many conflicts have raged against petty, tyrannical court systems that have tried unsuccessfully to invalidate the concept, is my right to criticize my government. What the Court is going to do in this case does not merely have a chilling effect on those rights-it is a blizzard. It effectively completes the downward spiral begun in the Alison case and effectively deprives 30,000 Maryland attorneys of anything remotely resembling human dignity. The Commission seeks to give Rule 8.4 d an interpretation that is so broad, so intentionally ill-defined, so vague, and so all-encompassing that it will make all of the other rules superfluous . . . . "

**420**

ble. In any event, the respondent asserts: "I had a substantial purpose in criticizing Wilbert Myles' conduct. I had no intent to embarrass, delay, or burden him. If such was the *result* of my decision to criticize a government, then the fault was his and not mine. I was delayed and burdened because of his *illegal* actions which did not even comply with his own training manual, let alone state or federal law."

It is well settled that, in attorney discipline cases, we review the findings of fact of the hearing court to determine whether they are based on clear and convincing evidence. *See Attorney Grievance Comm'n v. Post,* 379 Md. 60, 74, 839 A.2d 718, 726 (2003); *Attorney Grievance Comm'n v. Davis,* 375 Md. 131, 158, 825 A.2d 430, 446 (2003); *Attorney Grievance Comm'n v. Barneys,* 370 Md. 566, 577, 805 A.2d 1040, 1046 (2002); *Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992); *Attorney Grievance Comm'n v. Clements,* 319 Md. 289, 298, 572 A.2d 174, 179 (1990). Indeed, we conduct an independent review of the record. *Attorney Grievance Comm'n v. Wallace,* 368 Md. 277, 288, 793 A.2d 535, 542 (2002). Moreover, we have said, the "hearing court's findings of fact are prima facie correct and will not be disturbed unless they are shown to be clearly erroneous," *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997) (citing *Attorney Grievance Comm'n v. Goldsborough,* 330 Md. 342, 347, 624 A.2d 503, 505 (1993)). *See Attorney Grievance Comm'n v. McCoy,* 369 Md. 226, 234–235, 798 A.2d 1132, 1137 (2002), and that we will not disturb those factual findings if they are based on clear and convincing evidence. *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002). On the other hand, the ultimate question, whether a lawyer has violated the professional rules, what, in other words, to make of those facts, rests with this Court. *Post,* 379 Md. at 74, 839 A.2d at 726; *Garland,* 345 Md. at 392, 692 A.2d at 469; *Attorney Grievance Comm'n v. Breschi,* 340 Md. 590, 599, 667 A.2d 659, 663 (1995). *See Attorney Grievance Comm'n v. Sheinbein,* 372 Md. 224, 240, 812 A.2d 981, 990 (2002).

The findings of fact in this case are not clearly erroneous. In fact, there is ample evidence in the record, which we have independently reviewed, to support each of them. To be sure, the hearing court did not address expressly each of the defenses the respondent raised or specifically reject his various contentions concerning the complaining witness's credibility. As we stated recently, *see Attorney Grievance Comm'n v. Braskey,* 378 Md. 425, 446, 836 A.2d 605, 618 (2003), that is not required. In *Braskey,* we explained:

> "We are unable to say why the hearing judge omitted reference to respondent's testimony regarding the February calls. It may be that the judge did not believe respondent; it may have been an oversight. In any case, even if the judge believed respondent, the hearing judge is not required to recount all of the evidence presented at the hearing. *See Attorney Grievance Comm'n v. Granger,* 374 Md. 438, 453, 823 A.2d 611, 620 (2003) (noting that "it is elementary that the hearing judge 'may elect to pick and choose which evidence to rely upon' ")."

The respondent's exceptions, to the extent that they challenge the hearing court's findings of fact, are overruled.

Turning to the question of whether, as the petitioner contends, the respondent violated Rules 4.4 and 8.4(d) or, as the respondent maintains, the rules do not apply or he did not violate them, we have been referred to no case, and we have found none, in which the conduct sought to be sanctioned occurred under circumstances similar to those sub judice. In the cases on which the petitioner relies, including *Alison,* and the cases we have found, *see In the Matter of Weir,* 668 N.E.2d 679 (Ind.1996); *In the Matter of Burns,* 657 N.E.2d 738 (Ind.1995); *In the Matter of Vincenti,* 114 N.J. 275, 554 A.2d 470 (1989); *In the Matter of McAlevy,* 69 N.J. 349, 354 A.2d 289 (1976); *In the Matter of Mezzacca,* 67 N.J. 387, 340 A.2d 658 (1975), the offending conduct occurred during the actual litigation process or while interviewing clients or others in connection with litigation or potential litigation.

Thus, in *Burns*, the conduct for which the attorney was sanctioned consisted of threatening behavior and remarks made to a party to the litigation during the recess of a pretrial hearing. More specifically, the attorney said, *inter alia*,

"Let me ... let me warn you about something. If you file anything with the bankruptcy court against me, I'll be asking for attorney fees and punitive damages. You have my word on it, ... And the next time you write my client a letter, I'm not going to file anything with the Court; I'm going to come over to your house and I'm going to hit you in the head with a baseball bat. Now, you may not be practicing law, but you know better than that. If I ever find out you wrote my client a letter again or sent him anything, you've got me to deal with. Do you understand: You better understand it right now, because I'm not going to tell you a second time. Now, that's my promise to you, right here on the record. I'm going to come over to your house and beat you half to death with a baseball bat."

657 N.E.2d at 739. Later, the attorney, aware that he was speaking on the record, acknowledged that he was threatening the opposing party physically, adding:

"You'll either follow the rules or you'll have to deal with me. Do you understand? And if I have to tell you that again, you're going to go out of here in a hospital van. Don't press your luck, ... Don't press your luck. Because you're not going to like me if I'm angry. You won't walk away from it, I guarantee you. Don't look grave to me, because if you do, you're a ... (obscenity). swear to God."

*Id.* The court concluded that the respondent violated Rules 4.4 and 8.4(d), reasoning: his "threatening behavior to a defendant had no purpose other than to embarrass, delay, or burden such person. Conduct of this nature during the course of a legal proceeding is prejudicial to the administration of justice." *Id.*

The conduct, described by the court as rude, intimidating and disruptive, for which the respondent in *Mezzacca* was sanctioned—he was reprimanded—as in violation of Rules 4.4

and 8.4(d), occurred before an administrative review board conducting departmental hearings in connection with misconduct charges brought against the attorney's client. 340 A.2d at 658. The court summarized the offending conduct, as follows:

"When respondent appeared before the review board he challenged its right to hear the matter on the ground it was in no way legally constituted. He claimed the sheriff was biased against his client and was just looking for the opportunity to get rid of him. He asserted that the proceeding was a conspiracy to violate his client's civil rights and demanded that the hearing "stop right now." During the course of the hearing respondent referred to the board as a "Kangaroo Court." He said the hearing was "a waste of county money, perpetrated by a demented sheriff that thinks he is a King or a God." He characterized the members of the board as "Nazis, that's what you are." He told one of the members of the board that "You may have to answer to a higher tribunal than this before this is over, including the Grand Jury." He made numerous accusations as to lying and threatened several times to go to the prosecutor and have the person indicted. At one point respondent said: "If you want Mr. Jones to be indicted put him on the stand. Because I will see to it that he will be indicted. Believe me, he will be indicted." "

*Id.* at 658–59.

In *Vincenti,* the misconduct, for which the respondent was suspended for three months and until further order of court, occurred during a trial call and at the trial of a civil personal injury action that the respondent filed on behalf of his client. It consisted of engaging in a course of harassment and intimidation in an actively-litigated case in the Superior Court against his adversary and his witness, including challenging opposing counsel and his witness to a fight on several occasions, using loud, abusive, and profane language against his adversary and opposing witness, and, on at least one occasion, employing racial innuendo. 554 A.2d at 473. According to the court: "This conduct was pervasive and recurrent, continuing

from the time of the trial call until after the filing of a motion for a new trial. It indisputably was, or had the clear capacity to be, disruptive, distracting, and unsettling to persons having significant responsibilities and important roles in the handling of the litigation." *Id.*

The respondent in *McAlevy* was sanctioned, a reprimand, for misconduct during a criminal trial. At a bench conference out of the jury's hearing, the respondent responded to the request by the Deputy Attorney General to keep his voice down with a threat of physical violence. Subsequently, during a chambers conference, in the course of an argument concerning the scope of a sequestration order, the respondent, reacting to remarks of the Deputy Attorney General, flew into a rage, "sprang from his chair screaming, grabbed opposing counsel by the throat and began to choke him" and a melee between the two men thereafter ensued until broken up with the assistance of the judge, his law clerk and others.

There were three incidents in *Weir*. In each of them, the attorney, in the presence of a third party, in each instance a woman, fondled his genitals and or masturbated. In the first, he was meeting with a defendant in his capacity as Deputy Prosecuting Attorney to discuss resolution of her case by pretrial diversion. In the second, the woman was a client who was consulting the respondent about filing bankruptcy. The third incident also involved a client, a student, who was at the time engaged in working off the fee she owed the respondent by babysitting at his home.

In this case, the conduct in which the respondent engaged and the remarks he made to the third party, while occurring during the representation of a client and in the course of obtaining information beneficial to that client, did not occur in the courthouse or involve court personnel. Neither were the parties to the litigation or their attorneys involved in the confrontation or the objects of the respondent's conduct or remarks. And it was not during the actual litigation process or any one of its stages that the incident at issue took place. Rather, the confrontation was with, and the resulting conduct

and remarks were directed at, an agent of the custodian of the records that the respondent was attempting to obtain and was the result of the respondent's perception that the requirements for accessing the information imposed by the agent were improper and even illegal.

To be sure, at the foundation of the rule of law is respect for the law, the courts and judges who administer it. And the attorneys who practice law and appear in the courts are officers of the court. *McAlevy,* 354 A.2d at 290–291. Consistently, as Chief Justice Benham of the Georgia Supreme Court pointed out:

> "The practice of law is an honorable profession that requires a high standard of conduct of its members. It is a high calling where competence, civility, community service, and public service are integral parts of the professional standards. It is not a profession where disrespectful, discourteous, and impolite conduct should be nurtured and encouraged. Such conduct should be alien to any honorable profession.
>
> "Those who hold themselves out as lawyers should realize that they help shape and mold public opinion as to the role of the law and their role as lawyers. The law sets standards for society and lawyers serve as problem solvers when conflicts arise. To fulfill their responsibility as problem solvers, lawyers must exhibit a high degree of respect for each other, for the court system, and for the public. By doing so, lawyers help to enhance respect for and trust in our legal system. These notions of respect and trust are critical to the proper functioning of the legal process."

*Butts v. State,* 273 Ga. 760, 546 S.E.2d 472, 485–86 (2001) (Benham, C.J., Concurring).

■ It follows, therefore, and, indeed cannot be gainsaid, that attorneys are required to act with common courtesy and civility at all times in their dealings with those concerned with the legal process, *McAlevy,* 354 A.2d at 290–291, *see Alison,* 317 Md. at 537, 565 A.2d at 666, and that "[c]onduct calculated

to intimidate and distract those who, though in an adversarial position, have independent responsibilities and important roles in the effective administration of justice cannot be countenanced." *Vincenti*, 554 A.2d at 473. Thus, "[v]ilification, intimidation, abuse and threats have no place in the legal arsenal[,]" *Mezzacca*, 340 A.2d at 659, common courtesy and civility being expected from a member of the bar whether appearing before the State's highest court, some administrative body or proceedings ancillary to, but a necessary part of, the litigation. *Id.* This is so because the effectiveness of the adversary system depends on the effectiveness of adversary counsel and because conduct characterized by "the undue and extraneous oppression and harassment of participants involved in litigation" and "consciously and intentionally engage[d] in" perverts advocacy. *Vincenti* 554 A.2d at 473–74. Moreover,

"Such conduct redounds only to the detriment of the proper administration of justice, which depends vitally on the reasonable balance between adversaries and on opposing counsels' respect, trust, and knowledge of the adversary system. There cannot be genuine respect of the adversary system without respect for the adversary, and disrespect for the adversary system bespeaks disrespect for the court and the proper administration of justice."

*Id.* at 474. An attorney whose conduct in the practice of law is characterized by lack of civility, good manners and common courtesy tarnishes the image of what the bar stands for. *McAlevy*, 354 A.2d at 291.

As indicated, this case does not fall within this construct. The respondent was not dealing in this case with a person "concerned with the legal process;" the complainant is not a party to litigation in which the respondent is attorney, nor is he a witness or opposing counsel. Moreover, the respondent's interaction with the complainant was not during the course of litigation or court proceedings; while the respondent was representing a client, he was gathering information that may become evidence in a trial and, thus, he was engaged solely in

preparation for litigation, rather than actually being involved in litigation.

Nevertheless, it is true, this Court has interpreted the phrase, "prejudicial to the administration of justice" broader than the practice of law, to encompass "conduct the lawyer engages in outside his or her role as a lawyer." *Attorney Grievance Comm'n v. Childress,* 360 Md. 373, 383, 758 A.2d 117, 122 (2000). *See Attorney Grievance Comm'n v. Sheinbein,* 372 Md. 224, 251, 812 A.2d 981, 997 (2002) ("this Court has found conduct to be prejudicial to the administration of justice in violation of Rule 8.4(d) when there has either been conduct that is criminal in nature or conduct that relates to the practice of law"); *Attorney Grievance Comm'n v. Black,* 362 Md. 574, 766 A.2d 119 (2001) (finding a Rule 8.4(d) violation for possession of cocaine); *Attorney Grievance Comm'n v. Atkinson,* 357 Md. 646, 745 A.2d 1086 (2000) (failing to file, and pay, personal income taxes); *Attorney Grievance Comm'n v. Painter,* 356 Md. 293, 739 A.2d 24 (1999) (committing acts of domestic violence); *Attorney Grievance Commission v. Gilbert,* 356 Md. 249, 251, 739 A.2d 1, 2 (1999)("To be sure, it cannot be gainsaid that the possession of cocaine by a lawyer, an officer of the court, especially when it results in a conviction and probation is prejudicial to the administration of justice."). *See also Attorney Grievance Comm'n v. Richardson,* 350 Md. 354, 368, 712 A.2d 525, 532 (1998), in which we said:

"The respondent argues that to be conduct that is prejudicial to the administration of justice, the act must be one that hinders or otherwise interferes with a judicial proceeding of which he is a party or represents a party. This Court has never so narrowly defined Rule 8.4(d). We have instead recognized that conduct that impacts on the image or the perception of the courts or the legal profession, *see Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 536, 565 A.2d 660, 666 (1989) and that engenders disrespect for the courts and for the legal profession may be prejudicial to the administration of justice. Lawyers are officers of the court and their conduct must be assessed in that light."

We have suggested, however, but have not tested whether, a lawyer's non-criminal, purely private conduct might be a basis for discipline under Rule 8.4(d). *See Childress,* 360 Md. at 385–86, 758 A.2d 117. (suggesting that, while Rule 8.4(d) has been applied in our cases only to conduct which is related to the practice of law, directly or indirectly, or when there has been a criminal conviction or conduct which is criminal in nature, a lawyer's non-criminal, purely private conduct might be a basis for discipline under the Rule, noting specifically that "the harm, or potential harm, in a stranger soliciting sex over the Internet to young girls, after imploring them to keep the meeting a secret from their parents, is patent"). Because the conduct in *Childress* was arguably criminal, the issue was not addressed in that case.

The issue must be addressed in this case. The respondent's conduct, as found by the hearing court, was rude, boorish, insensitive, oppressive and certainly insulting, but it was not even arguably criminal. Nor was the respondent engaged in a purely personal pursuit. Although he was representing a client at the time of the incident, that fact was not readily apparent or sought to be emphasized. Indeed, the respondent resisted informing the complainant that he was a lawyer. A confrontation, with resulting similar behavior by the respondent, likely would have occurred in any event.

To be sure, conduct of the kind exhibited by the respondent in this case when directed toward a member of the public by a lawyer negatively affects the perception of lawyers and, in that sense, may breed disrespect for the legal profession and potentially for the courts. *See Alison,* 317 Md. at 536, 565 A.2d at 666. Undoubtedly, it reinforced the complainant's already negative view of lawyers. As important as civility and professionalism are as professional standards and as desirable as it is that civility and common courtesy be the rule of the day in the interpersonal relations between citizens, it is neither feasible nor desirable that every social interaction between a lawyer and a non-lawyer be regulated to insure that the lawyer acts, in each such instance, with the requisite

civility and courtesy.[13]  Only when such purely private conduct is criminal or so egregious as to make the harm, or potential harm, flowing from it patent will that conduct be considered as prejudicing, or being prejudicial to, the administration of justice.

This Court considers the respondent's conduct in this case to be most inappropriate and unfortunate, and it is conduct that we do not condone.  Nevertheless, it being neither criminal nor conduct of the kind that the harm or potential harm flowing from it is patent, we hold that it is not conduct that is prejudicial to the administration of justice and, thus, is not sanctionable.  The petition for disciplinary action is dismissed.

IT IS SO ORDERED.

WILNER, J., files concurring opinion, in which BATTAGLIA, J., joins.

RAKER, J., files opinion concurring in judgment only, in which ELDRIDGE, J., joins.

WILNER, Judge, concurring.

I join in the Court's Opinion, because I believe that, however inappropriate Link's behavior was, it did not constitute a violation of MRPC 8.4(d).  I write separately only to express my indignation over Link's behavior in this Court during argument on Bar Counsel's petition.  On more than one occasion, he accused Deputy Bar Counsel of suborning perjury, a criminal offense in this State.  He was questioned about that, whether his accusation was mere (but nonetheless grossly inappropriate) rhetorical flourish or whether he really

---

13. In response to the Report of the Task Force on Professionalism, chaired by the Honorable Lynne Battaglia, this Court authorized, on December 16, 2003, the formation of a Professionalism Commission. Its purpose is "to develop a consensus about the definition of professionalism and to examine ways to promote professionalism among Maryland's lawyers and to provide sustained attention and assistance to the task of ensuring that the practice of law remains a high calling, enlisted in the service of client and public good."  It is not intended to, and will not, be a vehicle for the micro-management of all aspects of the legal profession, including purely private activities and conduct.

meant to accuse bar counsel of criminal behavior, and he made clear that it was the latter.

There is utterly no basis in the record for such an accusation. Link's unsupported accusation cannot be used against him in this proceeding, but I find it inexcusable and deplorable. If Link continues to act as he has done, belittling other people and making unfounded accusations against them, he is surely headed for additional problems with Bar Counsel and with this Court.

Judge BATTAGLIA has authorized me to state that she joins in this concurring opinion.

RAKER, Judge, with whom ELDRIDGE, J. joins, concurring:

I concur in the judgment of the Court and would dismiss the petition because Bar Counsel has not sustained its burden to prove by clear and convincing evidence that respondent used a means in representing a client that had no substantial purpose other than to embarrass, delay or burden a third person, in violation of Rule 4.4. Respondent's conduct, although highly inappropriate and unprofessional, was not unethical subjecting him to discipline under the Rules of Professional Conduct.

## I.

I disagree with the majority's conclusion that because respondent, although he was representing a client, was not dealing with a person concerned with the legal process, this case does not fall within the construct of Rule 4.4, Respect for Rights of Third Persons. *See* maj. op. at 426. As I read the majority opinion, the majority determines that in order to come within the ambit of Rule 4.4, the complainant must be a party to the litigation in which the respondent is an attorney, a witness or opposing counsel. *Id.* at 426–27. Moreover, gathering information in preparation for a trial or conduct in preparation for litigation would not fall within the Rule. It seems to me that Rule 4.4 is broad enough to cover the conduct of a lawyer who, while acting in that capacity, inter-

acts with a State employee and uses means in representing a client which have no substantial purpose other than to embarrass, delay or burden a third person.

In considering whether respondent violated Rule 4.4, we look at the purpose of his actions rather than the effect. Maryland Rule 4.4 focuses on the "substantial purpose" of the lawyer's actions, and not on the effect the conduct might have upon the third person. *See* American Bar Association, Annotated Model Rules of Professional Conduct R. 4.4 cmt. at 424 (4th ed. 1996); *Idaho State Bar v. Warrick,* 137 Idaho 86, 44 P.3d 1141, 1145 ( 2002); *Mississippi Bar v. Robb,* 684 So.2d 615, 621 (Miss.1996). I agree with the majority's analysis that respondent's confrontation in the matter *sub judice* "was with, and the resulting conduct and remarks were directed at, an agent of the custodian of the records that the respondent was attempting to obtain and was the result of the respondent's perception that the requirements for accessing the information imposed by the agent were improper and even illegal." Maj. op. at 425. Although respondent was rude, his purpose was not to embarrass, delay or burden a third person. Accordingly, Bar Counsel has not proven a violation of the Rule.

## II.

I also do not subscribe to the majority's construct of Rule 8.4(d). The majority sets out a two-prong test to determine if a lawyer's conduct comes within the Rule: "Only when such purely private conduct is criminal *or so egregious as to make the harm, or potential harm, flowing from it patent will that conduct be considered as prejudicing, or being prejudicial to, the administration of justice."* Maj. op. at 428–29 (emphasis added). I agree that the Rule covers criminal conduct. I do not agree, however, with the view that the Rule is applicable to any conduct which is so egregious as to make the harm, or potential harm, flowing from it patent. The phrase "prejudicial to the administration of justice" is not defined in the Rules of Professional Conduct, nor do the rules or our case law give guidance for application to specific circumstances. The standard embraced by the majority is ambiguous and elusive. It

smacks of "I can't define it but I know it when I see it." Simply because some conduct is so obviously violative of the Rule and "prejudicial to the administration of justice" does not, in my view, save the Rule. It is unfair to lawyers in the State to be subject simply to the moral barometer of four judges of this Court. Due process requires more—a lawyer is entitled to have fair notice of conduct which would subject him or her to discipline under the Rules of Professional Conduct. The standard adopted by the Court today fails to give fair notice.

I would construe Rule 8.4(d) to apply to criminal conduct or, when dealing with private conduct, such conduct that is in some way connected to the practice of law. *See Attorney Grievance Comm'n v. Sheinbein,* 372 Md. 224, 812 A.2d 981(2002) (Eldridge, J., dissenting, joined by Raker, J.). Judge Eldridge pointed out that, until *Sheinbein,* this Court has found conduct to be in violation of Rule 8.4(d) only when there has been conduct that is criminal in nature, or when the lawyer's conduct concerned his own legal practice or his relationship with his clients. *Id.* at 276–77, 812 A.2d at 1011–12.

In sum, I do not subscribe to the majority's two-prong description of the various types of conduct which violate Rule 8.4(d) because that description does not capture an essential element, which is that the conduct must either be criminal conduct, or conduct that has some connection, directly or indirectly, to the practice of law.

Judge ELDRIDGE, authorizes me to state that he joins in this concurring opinion.