Attorney Grievance Commission of Maryland v. Patrick Guy Samuel Marie Merkle, Misc.
Docket AG No. 17, September Term, 2013. Opinion by Greene, J.

ATTORNEY DISCIPLINE – The hearing judge determined that the attorney involved did
not violate the Maryland Lawyers’ Rules of Professional Conduct. The findings of fact were
not clearly erroneous and the hearing judge did not abuse his discretion in applying the law
to the facts as he found them to be. Accordingly, where no rules of professional
responsibility were violated, the appropriate outcome, under the circumstances, is dismissal
of the Petition for Disciplinary or Remedial Action.
Circuit Court for Prince George’s County
Case No. CAE13-15574
Argued: October 6, 2014

 IN THE COURT OF APPEALS
 OF MARYLAND

 Misc. Docket AG No. 17

 September Term, 2013
 ______________________________________

 ATTORNEY GRIEVANCE COMMISSION
 OF MARYLAND

 v.

 PATRICK GUY SAMUEL MARIE
 MERKLE
 ______________________________________

 Barbera, C.J.
 Harrell
 Battaglia
 Greene
 Adkins
 McDonald
 Watts,

 JJ.
 ___________________________________

 Opinion by Greene, J.
 Harrell, Battaglia and Watts, JJ., dissent
 ___________________________________

 Filed: November 24, 2014
 On January 23, 2013, the Attorney Grievance Commission of Maryland (“Petitioner”),

acting pursuant to Maryland Rule 16-751(a), directed Bar Counsel to file a “Petition for

Disciplinary or Remedial Action” against Patrick G. Merkle (“Respondent” or “Merkle”).

Petitioner charged Respondent with several violations of the Maryland Lawyers’ Rules of

Professional Conduct (“MLRPC” or “Rules”), specifically MLRPC 1.1 (Competence),1 1.2

(Scope of Representation and Allocation of Authority Between Client and Lawyer),2 1.3

(Diligence),3 1.4 (Communication),4 1.6 (Confidentiality of Information),5 7.3 (Direct

1
 Under MLRPC 1.1: “A lawyer shall provide competent representation to a client.
Competent representation requires the legal knowledge, skill, thoroughness and preparation
reasonably necessary for the representation.”
2
 MLRPC 1.2 provides in relevant part:

 (a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client’s
 decisions concerning the objectives of the representation and, when
 appropriate, shall consult with the client as to the means by which they are to
 be pursued. A lawyer may take such action on behalf of the client as is
 impliedly authorized to carry out the representation. A lawyer shall abide by
 a client’s decision whether to settle a matter. . . .
 (b) A lawyer’s representation of a client, including representation by
 appointment, does not constitute an endorsement of the client’s political,
 economic, social or moral views or activities.
 (c) A lawyer may limit the scope of the representation if the limitation is
 reasonable under the circumstances and the client gives informed consent.
3
 Pursuant to MLRPC 1.3 “[a] lawyer shall act with reasonable diligence and
promptness in representing a client.”
4
 MLRPC 1.4 provides in pertinent part: “A lawyer shall explain a matter to the extent
reasonably necessary to permit the client to make informed decisions regarding the
representation.”
5
 Under MLRPC 1.6:

 (continued...)
Contact with Prospective Clients),6 and 8.4 (Misconduct).7

5
 (...continued)
 (a) A lawyer shall not reveal information relating to representation of a client
 unless the client gives informed consent, the disclosure is impliedly authorized
 in order to carry out the representation, or the disclosure is permitted by
 paragraph (b).
 (b) A lawyer may reveal information relating to the representation of a client
 to the extent that the lawyer reasonably believes necessary:
 (1) to prevent reasonably certain death or substantial bodily harm;
 (2) to prevent the client from committing a crime or fraud that is
 reasonably certain to result in substantial injury to the financial interests
 or property of another and in furtherance of which the client has used
 or is using the lawyer’s services;
 (3) to prevent, mitigate, or rectify substantial injury to the financial
 interests or property of another that is reasonably certain to result or has
 resulted from the client’s commission of a crime or fraud in furtherance
 of which the client has used the lawyer’s services;
 (4) to secure legal advice about the lawyer’s compliance with these
 Rules, a court order or other law;
 (5) to establish a claim or defense on behalf of the lawyer in a
 controversy between the lawyer and the client, to establish a defense to
 a criminal charge, civil claim, or disciplinary complaint against the
 lawyer based upon conduct in which the client was involved or to
 respond to allegations in any proceeding concerning the lawyer’s
 representation of the client; or
 (6) to comply with these Rules, a court order or other law.
6
 MLRPC 7.3 provides in relevant part:

 (a) A lawyer shall not by in-person, live telephone or real-time electronic
 contact solicit professional employment from a prospective client when a
 significant motive for the lawyer’s doing so is the lawyer’s pecuniary gain,
 unless the person contacted:
 (1) is a lawyer; or
 (2) has a family, close personal, or prior professional relationship with
 the lawyer.
7
 MLRPC 8.4 provides in pertinent part: “It is professional misconduct for a lawyer to:
 (continued...)

 2
 I. Findings of Fact and Conclusions of Law

 We referred the instant matter to Judge Herman C. Dawson of the Circuit Court for

Prince George’s County for an evidentiary hearing and to issue findings of fact and

conclusions of law pursuant to Md. Rule 16-757. After conducting a hearing, Judge Dawson

issued Findings of Fact and Conclusions of Law, in which he concluded that no violation of

MLRPC 1.1, 1.3, 1.4, 7.3, and 8.4 had occurred.8 In reaching this conclusion, Judge Dawson

made the following findings:

 Findings of Fact
 Respondent is admitted to the Maryland and District of Columbia Bars.
 Respondent maintains a law office located at 2120 L. Street, NW, Washington
 DC. His primary areas of practice include various types of civil litigation
 matters involving property rights.
 Respondent met Sheila Coates-Black[9 ], the Complainant, in October
 of 2008 while in the office of the Clerk of the District Court in the Prince
 George’s County Courthouse. While Ms. [Coates] was attempting to fill out

 (...continued)
(a) violate or attempt to violate the Maryland Lawyers’ Rules of Professional Conduct,
knowingly assist or induce another to do so, or do so through the acts of another; [or] . . . (d)
engage in conduct that is prejudicial to the administration of justice[.]”
8
 Although the Petition for Disciplinary or Remedial Action charged Respondent with
violations of MLRPC 1.2 and 1.6, and Bar Counsel argued before the hearing judge that
Rules 1.2 and 1.6 were violated, neither charge was specifically addressed by the hearing
judge in his Findings of Fact and Conclusions of Law. Moreover, Bar Counsel has not taken
exception to the hearing court’s failure to find a violation of MLRPC 1.2 and 1.6. As
discussed infra, we conclude that no violation of MLRPC 1.2 or 1.6 occurred. See infra note
11.
9
 For the purpose of clarity, we will refer to Respondent’s client as “Ms. Coates.”
“Black” was the client’s marital surname, which has since been changed following her
absolute divorce in 2013.

 3
a protective order, the Respondent informed her that she was filling out the
form incorrectly. Respondent gave Ms. Coates his business card and informed
her that he was an attorney. They began to discuss her possible divorce case
as well as a case that he was researching for a personal injury client at
Rosaryville Park.
 Respondent informed Ms. Coates that he had to visit Rosaryville Park
that afternoon. He expressed that he was willing to meet with her further so
the two, in separate vehicles, drove to Rosaryville Park. Once at the park,
Respondent and Ms. Coates discussed her case further, exchanged telephone
numbers, and departed from the park shortly after.
 Dating back to the initial meeting in October 2008, the Respondent[]
and [Ms.] Coates[] exchanged multiple emails and internet communication
prior to executing the two retainer agreements in March 2010. On November
18, 2008, Respondent forwarded Ms. Coates an electronic mail message
containing information about a jazz club in the D.C. area. The email stated,
“Dear Tahlibah, when I heard that you went to a jazz club, this is what I
thought of. I have been on the emailing list for Shore Jazz for years and keep
them in mind.”
 Petitioner introduced an email from Respondent to [Ms.] Coates from
December 10, 2008 in which he outlined a proposed course of action which
included [Respondent’s] statement that [Ms.] Coates should “. . . not hesitate
to consult another lawyer, if you are not satisfied with my approach or have
any reservations about working with me, including that I might call you when
I’m working on your case at 11:00 p.m. . . . I will, of course, defer to your
instructions.” Petitioner offered no evidence that [Ms.] Coates accepted
[Respondent’s] offer of representation which was inherently contained in this
email.
 During 2009, the Respondent and Ms. Coates became friends on
Facebook. On August 5, 2009, Ms. Coates posted two pictures to her
Facebook page. The first picture contained a message stating, “Erica, Shirrell
(Ms. Coates’[s] daughter), myself and Mr. Tolbert (a friend of Ms. Coates) we
were at a black tie affair [sic].”
 On November 11, 2009 at 10:20 a.m., Respondent posted a message to
Ms. Coates’[s] Facebook page claiming, “Maybe that’s me on Shirrell’s
tattoo!” Although Respondent testified that the picture of Mr. Tolbert
previously had his name, there was no evidence produced of said posting
during this hearing.
 On November 11, 2009 at 4:59 p.m., Ms. Coates posted a response to
Respondent’s message stating, “Funny! Please pardon me I missed that
appointment in D.C.”

 4
 On August 5, 2009, Ms. Coates posted a second picture to her Facebook
page depicting guests at an “all-white” party. Respondent responded to Ms.
Coates’[s] picture, “This looks more like an All-Black Party to me!”
 Respondent also posted two other Facebook comments in 2009.
Although Respondent claims that his representation of Ms. Coates did not
commence until February 2010, Ms. Coates’[s] Facebook page describes a
missed appointment in D.C. with Respondent in early November 2009.
 While these communications did occur, Respondent testified that the
two ceased to communicate on Facebook after the execution of the retainer
agreements. Two retainer agreements were signed in March 2010.
Respondent’s representation of [Ms.] Coates did not commence until they
affirmatively executed the two retainer agreements in March 2010 following
an escalation of conflict in [Ms.] Coates’[s] divorce matter.
 In the months immediately prior to the execution of the retainer
agreement, there was a great deal of email traffic between Respondent and Ms.
Coates. At one point, [Respondent] invited [Ms.] Coates to stay in a furnished
apartment as an escape from the declining relationship between Ms. Coates
and her husband. On March 8, 2010, [Respondent] declared in an email, “I
can say with confidence that you are at a point where you need representation.
We need to schedule an appointment.” In this email exchange, [Ms.] Coates
stated that she would come in on Wednesday, which was March 10th . Further,
[Ms.] Coates conveyed in her email detailed information she had obtained
about her husband’s preparation for divorce and that he was telling his lawyer
that he, [Ms.] Coates’s husband, was considering paying her $21,000.00 for
[Ms.] Coates to move out and resolve the divorce case in its entirety.
 Respondent filed both a divorce action and another civil action alleging
libel and slander against [Ms.] Coates’s husband, based on the claim that he
lied to obtain the protective order he requested on March 5, 2010. Respondent
acknowledged that filing the libel suit was risky because a party is largely
immunized against making libelous or slanderous statements against another
party during litigation. The case was filed as an intentional tort for three
reasons: First, he had been very successful in using suits for intentional tort as
a way of substantially enhancing financial settlement for clients facing the end
of a short-duration marriage who were victims of spousal abuse. Second, since
the cause of the breakup of a marriage is only one of many factors for the court
to consider in making an award for equitable distribution, Respondent’s
experience was that spousal abuse is simply not compensated, compared to the
potential results of a parallel suit for intentional tort. Third, there was no
actual physical contact between [Ms.] Coates and her husband upon which to
base a suit for intentional tort. Respondent’s emphasis on the underlying facts

 5
of the libel and slander case instead of seeking limited divorce based on cruelty
was simply a strategy and [Ms.] Coates was fairly informed about the
advantages and disadvantages of this strategy.
 Respondent finalized the draft of the complaint for divorce during the
week of July 2, 2010, which was during his week at Scout camp. He
forwarded the complaint to Ms. Coates by email. Ms. Coates filed the divorce
case on July 6, 2010 herself and had a third person serve it upon her husband.
Respondent contends that there was not a lapse of professional responsibility
in having [Ms.] Coates, who was plainly familiar with the process of filing
lawsuits, based on the multiple protective order and civil claim filings she
filed[,] . . . file and provide for service for her own divorce case.
 Petitioner asserted that the Respondent never filed a financial statement
that should accompany the complaint for divorce. Counsel for Ms. Coates’s
former husband, Aubrey Burton, testified that the parties agreed to early
mediation. [Mr.] Burton served discovery requests, but only discussed
delivery of discovery responses with Respondent after Respondent agreed to
vacate the default against [Mr.] Burton’s client in May 2011, entered because
[Mr.] Burton had not responded to the Court’s order of September 24, 2010 by
filing an answer for [Mr.] Black. He testified that the case got going on a fast
track after the order to vacate default was entered, and corroborated
Respondent’s testimony that the parties attempted to bifurcate the case and get
a divorce hearing on May 24, 2011, reserving equitable distribution until later,
but were thwarted in this effort by the hearing Master.
 [Mr.] Burton further testified that he did not file a motion to compel
discovery. The letter to [Respondent] of November 22, 2010 is not a demand
letter required under the discovery rules prior to filing a motion to compel or
for discovery sanctions. It simply states that [Mr.] Burton will “provide your
client with discovery materials once your client complies with his
Interrogatories and Request for Production of Documents. Please notify me
of when your client intends to provide responses to Mr. Black’s discovery
responses (sic).”
 Respondent referred to Ms. Coates as a “high maintenance” client.
Because of the high level of attention that Ms. Coates demanded, Respondent
assigned the task of dealing with her to his legal assistant, Kay Feegle. Ms.
Feegle assisted Ms. Coates with the preparation of her discovery requests.
 On July 7, 2011, Ms. Coates testified during the pendente lite hearing
before Master Paul Eason in the Circuit Court. Respondent called Ms. Coates
as a witness and asked her questions about her income. Respondent did not
introduce documentation of Ms. Coates’[s] medical bills. He also did not
introduce any evidence to corroborate her income during the hearing.

 6
Respondent did not call Mr. Black to the stand or demonstrate that Mr. Black
had the ability to pay temporary alimony using documentation he received
earlier in the year from Ms. Coates. Master Eas[]on denied Ms. Coates’[s]
request for pendente lite alimony for insufficient evidence. After the hearing,
Ms. Coates, Mr. Black, Mr. Burton and Respondent met in the courthouse to
discuss how Ms. Coates would obtain portions of her personal belongings from
the marital home.
 Although Respondent testified that Ms. Coates requested his assistance
in moving items from the marital home, both Mr. Burton and Ms. Coates
testified that Respondent offered to move Ms. Coates’[s] personal belongings.
Mr. Burton testified that Respondent suggested that he would move Ms.
Coates’[s] items using his Suburban truck. Respondent testified that [Ms.]
Coates carried a few handheld items into her residence herself, but that he was
the one who did the bulk of the unloading from her car.
 Respondent testified that by the time he was finished unloading [Ms.]
Coates’s car, he had a blinding headache. He attributed it to a combination of
two factors, heat and stress. The stress was associated with [Ms.] Coates’s
failure at the pendente lite hearing despite her promises the night before that
she knew how to answer all the financial questions, her misbehavior at [Mr.]
Black’s house, and her unnecessarily long route drive to her apartment.
 Respondent testified that he told [Ms.] Coates of his blinding headache
and that, upon request, she provided him with four Advil gelcaps, which he
stated was the same sort of headache medicine that he used. He testified that
he told [Ms.] Coates that he was going to sit in his vehicle with the air
conditioning running until his headache subsided enough that he could drive
away. Respondent testified that [Ms.] Coates told him that he should stay
inside her apartment, but the only available space to sit, other than the stools
in the kitchen, was half of her queen bed. Every available space on sofas,
chairs and half of her mattress were occupied with boxes, papers and other
items left where they’d been placed when she moved in during May.
Respondent testified that he accepted her invitation and laid down on her bed
for about 20 minutes before leaving. He testified that she was on the phone
during this time, and that he handled a call as well. Respondent did not make
any inappropriate comments or gestures towards Ms. Coates.
 Respondent did not file exceptions to Master Eas[]on’s
recommendation denying Ms. Coates pendent[e] lite alimony. Ms. Coates
testified that she could meet her expenses at the hearing, and had presented
[Respondent] with a financial statement consistent with her testimony.
Respondent argued that he intentionally omitted introducing any further
evidence from the hearing regarding [Ms.] Coates’s medical condition because

 7
 it would address equitable distribution, not [Ms.] Coates’s financial need as of
 July 7, 2011, and would show h[is] hand prematurely to the opposition.
 Respondent testifie[d] that he had a plan as to how he wanted Ms. Coates’[s]
 case to proceed and he did not want to tip his hand at the pendente lite hearing.
 On or about September 14, 2011, Ms. Coates informed Respondent that
 she was terminating his representation. After being informed of his
 termination, Respondent attempted on various occasions to inquire about the
 reasons for termination and the steps needed to be taken by Ms. Coates moving
 forward. Respondent filed a Motion to Strike Appearance on October 12,
 2011. On October 18, 2011, Respondent was stricken from the case by the
 court.
 The first divorce case where Respondent represented Ms. Coates was
 dismissed. The second divorce case was resolved by Ms. Coates’s former
 husband agreeing to pay [Ms.] Coates $600.00 in alimony for four years, with
 an initial alimony payment of $1,000.00, for a total of $29,200.00. [Mr.]
 Burton testified that the impetus for this settlement was [Ms.] Coates’s
 disability arising from surgery in 2012, after [Respondent] was off the case.

Judge Dawson further entered conclusions of law, concluding that Mr. Merkle had not

violated MLRPC 1.1, 1.3, 1.4, 7.3, and 8.4. He explained:

 Conclusions of Law

 ****

 A. [MLRPC] Rule 1.1 – Competence

 ****

 1. Bar Counsel alleges a lack of competence. Respondent demonstrated
 a creative and unique approach to maximizing the value of an equitable
 distribution case, which is what his representation of Coates involved, at its
 essence. The issues regarding the financial statements do not suggest a lack
 of competence; rather, they reflect the fact that the case went through periods
 of defendant’s protracted default, Coates’s own relocation without informing
 her counsel (and the substantial reduction in her housing cost estimate which
 resulted), and, in the end, Coates’s reporting that she was actually living within
 her means.
 2. Bar Counsel stresses that Respondent allowed Coates to file documents

 8
on her own behalf, but fails to note that Coates continued to file her own
protective order cases against her husband, without telling Respondent, during
the pendency of her divorce case. She even filed a default motion against
Black on her own, without telling her lawyer and certainly not at his request.
Coates was competent at filing documents in the clerk’s office, so it was
reasonable for her to assist in her own case in this way.
3. Bar Counsel seeks to interpose its own judgment that Respondent filed
the libel and slander case without a good faith basis, although no judge has
ever even considered this. Certainly, Coates’s statement that her husband had
lied extensively to obtain a protective order, resulting in significant
inconvenience to her, was reasonably relied upon by Respondent in drafting
that complaint. The fact that this would reasonably have been argued to
comprise a claim for extreme cruelty as grounds for limited divorce has not
been considered by Bar Counsel. Based on Respondent’s experience in using
intentional tort cases as leverage in equitable distribution cases involving
marriages of short duration, this attempt to leverage the cruelty for what it was
– false statements designed to hurt Coates – was well within a good faith basis,
regardless of the outcome.
4. Bar Counsel claims that the libel and slander case was dismissed for
failure to state a cause of action; however, there was no evidence provided at
the hearing to support that.
B. [MLRPC] Rule 1.3 – Diligence

 ****

5. Bar Counsel alleges a lack of reasonable diligence and promptness on
Respondent’s part in connection with his response to discovery propounded by
opposing counsel. Here, Bar Counsel, rather than Mr. Burton who was
opposing trial counsel in the divorce matter, is asserting a discovery violation
for a default in providing discovery. In the absence of any intervention by the
Court in this regard, no motion was filed prior to Respondent’s termination by
Coates, and in particular considering the fact that opposing counsel had
disappeared for months and was in default in May 2011, this Court is not going
to regard Respondent’s efforts regarding discovery as too little, too late. He
finalized the interrogatories and provided Coates with the tools to assist in
responding to [a] request for production of documents, and was in agreement
with opposing counsel to supply discovery in time for the September 28, 2011
mediation when Coates terminated his role in the case.

 9
C. [MLRPC] Rule 1.4(b) – Communication

 ****

6. Bar Counsel alleges that Respondent failed to explain Ms. Coates’s
matter to her sufficiently for her to make informed decisions regarding the
representation. Bar Counsel fails to show how Coates was denied the
opportunity to weigh in on any decisions affecting the case or regarding the
representation which were impacted by this allegation. Respondent testified
that Coates was a “high maintenance” client. The sheer volume of email
traffic between Respondent and Coates reveals the fact that he not only
responded to her inquiries, he consistently provided information to her about
the strategy of the case. Respondent testified that he was well prepared with
Coates’s medical information for the May 24, 2011 merits hearing which was
cancelled. The response to interrogatory No. 2 reveals that Respondent was
aware of at least four physicians and was prepared to submit reports from each
of them in respect of Ms. Coates’s physical and emotional condition. Bar
Counsel requests that the Court speculate regarding whether Mr. Burton might
have taken a different approach to settlement of the case “had he been aware
of Ms. Coates’s medical condition.” In the same paragraph, Bar Counsel notes
that “Mr. Burton testified that her back injuries had been a factor throughout
the marriage . . .” The Court finds that Burton was aware of the medical
ailments that Ms. Coates suffered during the time that Respondent represented
her.
7. Bar Counsel points to emails from Coates to Respondent during Mr.
Burton’s hiatus from the case as evidence that Respondent was deficient in his
responsiveness to his own client, or putting her case on hold. Under the
circumstances of this case, it cannot fairly be claimed that Respondent was
dilatory in the progress of the case. In fact, but for Respondent obtaining an
order for default, there’s no telling how long the case might have languished.
Importantly, Coates was residing in the same house as her estranged husband,
and undoubtedly felt pressure from this. However, the client was not
experiencing issues because of not being kept informed about the case by
Respondent.
D. [MLRPC] Rule 7.3 – Direct Contact with Prospective Clients

 ****

8. Bar Counsel argues that Respondent’s communications with Coates
following their informal meeting is akin to a cold call by a lawyer initiating

 10
 contact with train crash victims in their hotel where they were placed
 following the accident. Respondent testified that he declined to represent
 Coates at the outset of their communication, stating that she had no grounds
 for a case yet. Two months later, when he provided a suggested outline of his
 strategy for representation, he also advised Coates to consult other counsel as
 well. It was clear that he intended that she would have no obligation to him
 whatsoever if she didn’t like his approach to solving her situation. After
 providing a suggested course of action, Respondent did not contact Ms. Coates
 again until she contacted him through social media or when she contacted him
 when the police were at her door seeking to arrest her.[10 ] Plainly, from the
 very beginning of their communication, Respondent simply became a person
 known to Coates who was a lawyer, who was accessible to her by phone and
 email, and with whom she could discuss her situation with no obligation on
 either party’s part.
 E. [MLRPC] Rule 8.4 – Misconduct

 ****

 9. The Court declines to find that Respondent’s conduct was prejudicial
 to the administration of justice. Bar Counsel did not introduce any evidence
 of Coates’s mental state at the hearing, yet argued in her closing that Coates
 was a vulnerable individual who Respondent took advantage of. Certainly
 Respondent did not obtain any financial advantage from Coates, who was
 never in a position to pay for the legal services he provided.
 10. The Court finds that Respondent’s initial representation of Coates did
 not occur until March 10, 2010, when the parties executed the first retainer
 agreement. Until that time, as the Court has previously stated, Respondent was
 available as a contact to Coates, but not actually engaged in her behalf until the
 parties met and formalized the scope of work Respondent would undertake for
 Coates. Coates had the opportunity to formally engage Respondent on terms
 he outlined to her on December 10, 2008; however, she did not act upon that.
 The Court credits Respondent’s testimony and not Bar Counsel’s argument to
 the contrary, that Respondent declined to represent Coates in October 2008.
 Bar Counsel makes much ado regarding Respondent giving his business card

10
 Ms. Coates’s former husband, Mr. Black, obtained a temporary protective order
against Ms. Coates. According to Ms. Coates’s testimony before the hearing court, Ms.
Coates was served with the order and asked to surrender a handgun and move out of the
marital residence. The court subsequently dismissed the order on Mr. Black’s request.

 11
 to Coates. The Court takes notice that many lawyers would provide their
 business cards as a matter of course to persons in introduction. After Coates
 then declined to retain Respondent, as the Court has stated, Respondent was
 willing to make himself available to answer Coates’s phone calls and emails
 and, as her domestic situation escalated, Respondent agreed to represent her
 about 15 months later.
 11. Bar Counsel appears to argue that Respondent established an attorney-
 client relationship with Coates either by handing him his business card or
 sending her an email outlining his proposed strategy for her case. That would
 [mean] that even talking to a lawyer creates an attorney-client relationship, or
 that if a client declines to hire the lawyer according to the work outlined, an
 attorney-client relationship has been established. That is hard to accept as true.
 It would eliminate the public’s ability to even approach lawyers for informal
 conversation, and lawyers would stop handing out business cards and making
 proposals based on issues presented to them by prospective clients. Such a
 rule would be far more detrimental to the administration of justice than
 anything presented to the Court in hearing of this grievance.
 12. Bar Counsel faults Respondent for staying in touch with Coates after
 she terminated his services, to the point, Bar Counsel claims, of harassing her.
 That simply cannot be shown from this record. Respondent necessarily
 requested advice from Coates regarding referral of her case file to new
 counsel. Respondent testified that he did not protest his representation being
 terminated, but that he was concerned that there be an orderly transition to
 substitute counsel. There was no such transition, and Coates represented
 herself for some time.

 Finding no violation, the hearing judge recommended that we dismiss the instant

matter. Petitioner excepts to the hearing judge’s (1) conclusion of law that no violation of

MLRPC 7.3(a) occurred, (2) failure to find that Ms. Coates was emotionally vulnerable at

the time of her interaction with Respondent, and (3) conclusion of law that no violation of

MLRPC 8.4(d) occurred. Petitioner recommends that Respondent be reprimanded, if this

Court determines that Respondent violated MLRPC 7.3(a) only, or, alternatively, that

Respondent be suspended for thirty days, if this Court determines that Respondent violated

 12
MLRPC 8.4(d). Respondent takes no exceptions to the hearing judge’s findings.

 II. Discussion

 A. Standard of Review

 In attorney discipline proceedings, “this Court has original and complete jurisdiction

and conducts an independent review of the record . . . [T]he hearing judge’s findings of fact

generally will be accepted unless they are clearly erroneous.” Attorney Grievance Comm’n

v. Cherry-Mahoi, 388 Md. 124, 152, 879 A.2d 58, 76 (2005) (citations omitted). In making

his or her findings of fact, “[t]he hearing judge is permitted to ‘pick and choose which

evidence to rely upon’ from [the] conflicting array [of facts presented].” Attorney Grievance

Comm’n v. Guida, 391 Md. 33, 50, 891 A.2d 1085, 1095 (2006) (quoting Attorney Grievance

Comm’n v. Fezell, 361 Md. 234, 253, 760 A.2d 1108, 1118 (2000)). Moreover, “the hearing

judge is not required to recount all of the evidence presented at the hearing.” Attorney

Grievance Comm’n v. Link, 380 Md. 405, 421, 844 A.2d 1197, 1207 (2004) (quoting

Attorney Grievance Comm’n v. Braskey, 378 Md. 425, 446, 836 A.2d 605, 618 (2003)).

“This deference accorded to the hearing judge’s findings is appropriate, in part, because the

fact finder is in the best position to assess the demeanor-based credibility of a witness.”

Attorney Grievance Comm’n v. Edib, 415 Md. 696, 707, 4 A.3d 957, 964 (2010) (citations

omitted). Under Maryland Rule 16-759(b)(2)(B), “[i]f exceptions are filed, the Court [] shall

determine whether the findings of fact have been proven by [clear and convincing evidence

by the Petitioner].” Or put differently, this Court will not disturb the hearing judge’s factual

 13
findings if they are based on clear and convincing evidence. Attorney Grievance Comm’n

v. Stolarz, 379 Md. 387, 397, 842 A.2d 42, 47 (2004).

 The hearing judge’s proposed conclusions of law are reviewed for legal correctness.

Attorney Grievance Comm’n v. West, 378 Md. 395, 410, 836 A.2d 588, 596 (2003). “In

other words, the ultimate determination . . . as to an attorney’s alleged misconduct is reserved

for this Court.” Attorney Grievance Comm’n v. De La Paz, 418 Md. 534, 552, 16 A.3d 181,

192 (2011) (citation omitted). Having reviewed Judge Dawson’s findings, we agree that

Respondent has committed no violation of MLRPC 1.1, 1.3, 1.4, 7.3, and 8.4. We conclude

that Petitioner did not satisfy its burden of persuasion with regard to the alleged violations.11

11
 As noted above, the hearing judge made no specific findings of fact or conclusions
of law with respect to MLRPC 1.2 and 1.6. Bar Counsel has not directed this Court to any
evidence in the record, including findings of fact, that would support a violation of MLRPC
1.2 or 1.6. In addition, based upon our independent review of the record, including the
findings of facts, we find no basis to sustain these charges.
 Petitioner argued, in her opening statement before the hearing court, that Respondent
violated MLRPC 1.2 by “allow[ing] Ms. Coates to file her own pleadings, affidavits, and to
complete her own financial statement mainly without the support of counsel[.]” Hearing
Transcript, vol. I, at 6:3-6:8. Apart from this conclusory statement, Bar Counsel did not
explain, in the Petition for Disciplinary or Remedial Action, at the disciplinary hearing, or
in Petitioner’s Exceptions, exactly how this conduct violated MLRPC 1.2(a). The hearing
judge found that Ms. Coates was “plainly familiar with the process of filing lawsuits.” This
finding would not support a legal conclusion that Merkle violated Rule 1.2.
 Petitioner also argued in her opening statement before the hearing court that
Respondent violated MLRPC 1.6 by including confidential information without Ms. Coates’s
consent in his Motion to Strike Appearance. Hearing Transcript, vol. I, 8:2-8:5. Bar Counsel
argued in her closing that “Rule 1.6 is violated when [Respondent] filed Ms. Coates’s
complaint with our office, and as the Court’s views dessert Rule 16-723(b) [sic]. . . Counsel
cannot use Bar Counsel’s investigation in a public proceeding.” Hearing Transcript, vol. II,
65:14-65:20. Absent any evidence or explanation elsewhere in the record as to how
 (continued...)

 14
 B. MLRPC 7.3(a)

 Petitioner first excepts to the hearing judge’s conclusion of law that Respondent

committed no violation of MLRPC 7.3(a). Under the Rule “[a] lawyer shall not by in-person,

live telephone or real-time electronic contact solicit professional employment from a

prospective client when a significant motive for the lawyer’s doing so is the lawyer’s

pecuniary gain[.]” The purpose of prohibiting in-person solicitation is contained in the

Commentary to the Rule, which states:

 [1] There is a potential for abuse inherent in direct in-person, live telephone
 or real-time electronic contact by a lawyer with a prospective client known to
 need legal services. These forms of contact between a lawyer and a
 prospective client subject the layperson to the private importuning of the
 trained advocate in a direct interpersonal encounter. The prospective client,
 who may already feel overwhelmed by the circumstances giving rise to the
 need for legal services, may find it difficult fully to evaluate all available
 alternatives with reasoned judgment and appropriate self-interest in the face
 of the lawyer’s presence and insistence upon being retained immediately. The
 situation is fraught with the possibility of undue influence, intimidation, and
 over-reaching.

Petitioner contends that Respondent’s initial interaction with Ms. Coates went beyond that

of an ordinary social introduction, as characterized by the hearing judge. Rather, Bar

Counsel avers that Respondent’s contact with Ms. Coates evinced a motive to (1) solicit Ms.

Coates as a client in order to gain a monetary benefit, and (2) develop a personal relationship

11
 (...continued)
Respondent violated MLRPC 1.6, we do not interpret Bar Counsel’s conclusory argument
to be evidence of a violation. Accordingly, we have no basis for declaring that Mr. Merkle
violated MLRPC 1.6.

 15
with Ms. Coates.12 As discussed below, we agree with the hearing judge’s conclusion that

Respondent was neither attempting to solicit representation nor motivated by monetary gain.

 Although Respondent initiated a conversation with Ms. Coates, informed Ms. Coates

that he was an attorney, handed her his business card, discussed her case, and the two

exchanged telephone numbers, Petitioner has failed to show, clearly and convincingly, that

Respondent’s motive in doing so was for pecuniary gain. Indeed, the hearing judge found

that Respondent declined to represent Ms. Coates in October 2008, when the two first met.

That Respondent sent Ms. Coates an email two months later in which he detailed a case

strategy does not indicate clearly that he was attempting to solicit business from Ms. Coates

when the two individuals met. Moreover, Respondent and Ms. Coates did not enter into a

retainer agreement until fifteen months after meeting in-person. The hearing judge made no

finding that the circumstances were overwhelming or unduly influential for Ms. Coates.

Respondent’s conduct appears to have arisen from his desire to provide Ms. Coates with

information, as opposed to a desire to represent her. Where an attorney refuses initially to

represent the prospective client, does not insist that he be retained immediately, and the

circumstances do not indicate that the prospective client felt undue pressure to seek

representation, the facts do not support the conclusion that MLRPC 7.3(a) has been violated.

12
 The motive to develop a personal relationship with Ms. Coates, although important
to Bar Counsel’s arguments elsewhere, has little bearing on whether Respondent violated
MLRPC 7.3(a). The prohibition on in-person solicitation considers whether the lawyer’s
motive was pecuniary, not romantic, gain.

 16
 Bar Counsel points to several cases, relying principally on Attorney Grievance

Comm’n v. Franz, 355 Md. 752, 736 A.2d 339 (1999), in addition to Attorney Grievance

Comm’n v. Gregory, 311 Md. 522, 536 A.2d 646 (1988) and Attorney Grievance Comm’n

v. Weiss, 300 Md. 306, 477 A.2d 1190 (1984), in support of its position. In Franz, this Court

upheld the hearing judge’s conclusion that the respondents, Keith Franz and Judson

Lipowitz, violated MLRPC 7.3(a) by actively seeking out victims of a train accident

immediately after the incident. 355 Md. at 756-58, 736 A.2d at 341-42. The respondents

spoke by telephone shortly after learning about a train accident near Silver Spring, Maryland.

355 Md. at 756, 736 A.2d at 341. They decided to travel to a hotel, which had been

established as a headquarters by the railroad companies following the collision, in order to

investigate the accident. Id. While at the hotel, respondents initiated contact with several

victims. Id. Respondents informed the victims that they were attorneys and handed out

business cards, telling some victims that they wished to represent them. Id. Respondents did

not bring retainer agreements with them and advised the victims to consult with others before

making a decision as to any representation. Id. The respondents subsequently made follow-

up telephone calls and in-person visits to the prospective clients, some of which ultimately

decided to retain respondents. Id. After being retained by some of the victims, respondents

determined that their conduct was improper and self-reported to the Attorney Grievance

Commission, accepting responsibility for their violations of MLRPC 7.3(a) among other

things. 355 Md. at 757, 736 A.2d at 341.

 17
 We find Bar Counsel’s reliance on Franz in the instant case to be misplaced.

Petitioner attempts to drawn an analogy by noting that, similar to Franz, Mr. Merkle initiated

contact with Ms. Coates in-person, there was a delay in signing the retainer agreements, and

Ms. Coates was given the opportunity to decline Respondent’s representation. Unlike the

attorneys in Franz, however, there is no indication that Mr. Merkle went to the courthouse

for the purpose of soliciting potential clients. Bar Counsel points out that Respondent sent

Ms. Coates a proposed course of action, in which he also advised her to consult other

attorneys some two months after meeting her. The hearing judge found, however, that

Respondent did not communicate with Ms. Coates again until she contacted him through

email and Facebook or when she contacted Respondent after police arrived at her residence

to enforce a protective order.13 Moreover, there is no indication that the circumstances

surrounding Respondent’s interaction with Ms. Coates presented the same concern for

potential abuse or undue influence as there was in Franz. Indeed, the attorneys’ conduct in

Franz gave rise to such concerns because the ability of the victims of a train collision, which

killed and injured multiple passengers, to evaluate the desirability of retaining counsel was

particularly susceptible to improper influence in the face of an attorney’s insistence that he

be retained.14 In our view, soliciting individuals immediately following a catastrophic event

13
 See supra note 10.
14
 The conduct of several attorneys following the 1996 train collision in Silver Spring,
Md., drew sharp criticism from the public. See Mark Hyman and Sandy Banisky, Lawyers
Sniff Out Victims; Train Crash: Soliciting Business After the Silver Spring Marc-Amtrak
 (continued...)

 18
does not present the same concerns as does the interaction between an attorney and a

potential client in the instant case. Nor is there a similarity between intentionally traveling

to the scene of an accident for the purpose of soliciting business, as in Franz, and offering

advice to an individual who happened to be in the courthouse at the same time, but declining

any representation, as in the present case.

 This Court is likewise unpersuaded by Petitioner’s reference to Gregory and Weiss.

In Attorney Grievance Comm’n v. Gregory, 311 Md. 522, 536 A.2d 646 (1988), the

attorney’s practice of introducing himself as an attorney and handing out letters soliciting

business to defendants outside the courtroom after the defendants had just been advised of

their right to counsel was held to constitute a clear violation of the ethical restrictions

imposed on in-person solicitation. Similarly, in Attorney Grievance Comm’n v. Weiss, 300

Md. 306, 477 A.2d 1190 (1984), this Court upheld the hearing judge’s determination that the

attorney improperly solicited clients by, among other things, waiting in the back of the

courtroom and speaking with prospective clients regarding representation as they were

leaving the courtroom. What pervades all three cases cited to by Petitioner is the attorneys’

efforts to actively seek out clients. In the instant matter, there is no indication that

14
 (...continued)
Train Collision, Aggressive Lawyers Intruded on the Grief of Families. Some of their
Subsequent Actions May Violate Rules of Professional Conduct, Balt. Sun, March 13, 1996,
at 1A. Indeed, this is the very conduct–which not only severely damages the public’s
perception of attorneys, but more importantly has the potential to harm members of the
public–that MLRPC 7.3(a) aims to prevent.

 19
Respondent’s intent was to solicit Ms. Coates, or any other individual in the courthouse, for

representation. Rather, as the hearing judge found, this appears to be a situation in which

there was no expectation or obligation of representation at the outset.

 C. Factual Exception

 Petitioner has taken exception to the hearing judge’s finding that Bar Counsel failed

to produce evidence regarding Ms. Coates’s mental state. Bar Counsel asks this Court to

conclude that Ms. Coates was in a vulnerable state, pointing to testimony adduced at the

hearing in the Circuit Court and emails exchanged between the Respondent and Ms. Coates.

 As explained above, we ordinarily accept the hearing judge’s findings of fact unless

they are clearly erroneous. Attorney Grievance Comm’n v. Cherry-Mahoi, 388 Md. 124, 152,

879 A.2d 58, 76 (2005) (citations omitted). “The rationale behind the clearly erroneous

standard is settled. The trial judge is physically present during the testimony and is able to

observe matters not usually reflected in a cold record, such as the demeanor and credibility

of witnesses.” In re Anthony W., 388 Md. 251, 278, 879 A.2d 717, 733(2005). In applying

the “clearly erroneous” standard, “[i]f there is any competent evidence to support the factual

findings below, those findings cannot be held to be clearly erroneous.” Washington v. State,

424 Md. 632, 651, 37 A.3d 932, 943 (2012). The hearing judge “is permitted to ‘pick and

choose which evidence to rely upon’ from a conflicting array” when making his or her

findings. Guida, 391 Md. at 50, 891 A.2d at 1095 (quoting Fezell, 361 Md. at 253, 760 A.2d

 20
at 1118). Importantly, “the hearing judge is not required to recount all of the evidence

presented at the hearing.” Attorney Grievance Comm’n v. Link, 380 Md. 405, 421, 844 A.2d

1197, 1207 (2004) (quoting Attorney Grievance Comm’n v. Braskey, 378 Md. 425, 446, 836

A.2d 605, 618 (2003)); see Attorney Grievance Comm’n v. Granger, 374 Md. 438, 453, 823

A.2d 611, 620 (2003). “The [hearing judge] is not only the judge of a witness’s credibility,

but is also the judge of the weight to be attached to the evidence.” In re Anthony W., 388

Md. at 279, 879 A.2d at 733 (quoting $3,417.46 U.S. Money v. Kinnamon, 326 Md. 141, 149,

604 A.2d 64, 67 (1992)). This decision is left to the discretion of the hearing judge precisely

because it depends, to a great extent, on assessing the credibility of the witnesses. Md. Rule

16-759(b)(2)(B) (We “shall give due regard to the opportunity of the hearing judge to assess

the credibility of witnesses.”).

 In support of its argument, Petitioner directs this Court to the following testimony

from Ms. Coates, adduced before the hearing court:

 Q: You were in an emotionally abusive arrangement staying at
 [your marital home], right?
 A: Sometimes.
 ****
 Q: Ms. Coates, why did you file the protective orders against your
 husband?
 A: We had been going back and forth. Either we were going to get
 back together – it was just back and forth, back and forth.
 ****

 21
 A: Because I was afraid. He became so abusive. We were going
 back and forth.
Bar Counsel also cites to Respondent’s testimony before Judge Dawson, namely his response

that “I have a pretty good deal of experience somewhere on the order of 15 cases involving

short duration marriages with, I want to say, violence[,] but Ms. Coates-Black, her violence

is really emotional violence, this back and forth stuff with the TPOs[.]” Bar Counsel notes

lastly that several emails exchanged between Ms. Coates and Mr. Merkle reference Ms.

Coates’s emotional situation.

 The hearing judge’s findings of fact are not clearly erroneous.15 The hearing judge,

in reaching his conclusion that no violation of MLRPC 8.4(d) occurred, noted that “Bar

Counsel did not introduce any evidence of [Ms.] Coates’s mental state at the hearing, yet

argued in her closing that [Ms.] Coates was a vulnerable individual who Respondent took

advantage of.” The testimony and emails offered into evidence during the disciplinary

hearing in the Circuit Court were among the “conflicting array” of evidence, which the

hearing judge assessed. Ultimately, however, the hearing judge did not find this evidence,

which represented only a fraction of the entirety of the record presented to the hearing judge,

to clearly and convincingly indicate that Ms. Coates suffered from a particularly vulnerable

state, mentally or physically. To say that Ms. Coates was “afraid” or that her husband

“became so abusive” without more details, context or explanation does not constitute clear

15
 To be sure, Bar Counsel does not explicitly state that the hearing judge’s findings are
clearly erroneous.

 22
and convincing evidence of Ms. Coates’s mental state or their marital discord. Bar Counsel

directs us to conclusory statements and unsubstantiated claims upon which we are asked to

make demeanor-based, factual inferences. Ms. Coates’s and Mr. Merkle’s conclusory

statements, without some corroborating evidence, are insufficient to establish the extent to

which Ms. Coates was vulnerable under the circumstances.16 Moreover, the evidence is not

enough to show that the hearing judge’s findings of fact were clearly erroneous. Therefore

we decline the invitation to substitute our own judgment for the hearing judge’s assessment

of the evidence regarding Ms. Coates’s mental state.

 In any event, even if Bar Counsel had effectively presented evidence sufficient to

establish Ms. Coates’s mental state, as discussed infra, Petitioner has failed to show that Mr.

Merkle took advantage of, or “preyed on,” this purported fragility in an effort to develop a

romantic relationship with Ms. Coates. In other words, sustaining Petitioner’s factual

exception would have no bearing on this Court’s legal conclusions.

 D. MLRPC 8.4(d)

 Bar Counsel has taken exception to the hearing judge’s conclusion of law that

Respondent did not violate MLRPC 8.4(d). The gravamen of Petitioner’s exception is that

Respondent’s conduct is indicative of his misuse of the attorney-client relationship in an

16
 To be clear, we are making no comment as to whether Ms. Coates could have been
in a vulnerable mental state. Rather, we are sustaining the hearing judge’s conclusion
regarding the sufficiency of the evidence presented.

 23
effort to develop a sexual relationship with Ms. Coates. We overrule Petitioner’s exception

noting (1) Bar Counsel’s reliance on facts not contained within the hearing judge’s findings,

and (2) the lack of evidence to support an MLRPC 8.4(d) violation.

 To bolster the contention that Respondent sought to develop a romantic relationship

with Ms. Coates, Petitioner relies on several alleged interactions between Respondent and

Ms. Coates, specifically: (1) Facebook communications; (2) Respondent’s offers to have Ms.

Coates use his rental property; (3) Respondent’s unexpected, late-night visit to Ms. Coates’s

home; (4) Respondent’s request for a back massage; (5) Respondent’s comments about Ms.

Coates’s attire; (6) Respondent’s offer to help Ms. Coates move out of her marital home; and

(7) Respondent’s lying on Ms. Coates’s bed following the move–which Bar Counsel refers

to as “the culmination of months of his subtle prodding to become closer to [Ms. Coates].”

Petitioner avers that each of these instances are supported by evidence contained in the

record below, however, many of the allegations upon which Bar Counsel relies were not

established as true by the hearing judge. Moreover, many of the allegations Bar Counsel

relied upon, both before this Court and before the hearing judge, were in dispute. With

regard to the allegations not in dispute, Bar Counsel failed to demonstrate how those facts

were indicative of Respondent’s attempt to develop an improper, romantic relationship with

Ms. Coates.17 As discussed above, this Court does not serve as a fact finder and we are not

17
 For example, although Respondent offered Ms. Coates the use of his rental property,
the evidence does not suggest that Respondent’s intent was that the two would stay there
 (continued...)

 24
in a position to weigh the credibility of the witnesses in order to determine, for instance,

whether to credit Respondent’s or Ms. Coates’s conflicting testimony regarding an alleged

massage request. Further, we will not substitute our judgment for that of the fact finder, to

overrule, for instance, the hearing court’s findings regarding the circumstances of

Respondent’s laying down following Ms. Coates’s move–namely that Ms. Coates told him

he could rest inside due to his headache–in order to credit Bar Counsel’s interpretation of the

event–that this was “the culmination of months of [Respondent’s] subtle prodding to become

closer to [Ms. Coates].” Bar Counsel does not contend that the hearing judge’s findings of

fact were clearly erroneous. To the contrary, the contention is essentially that the hearing

judge made the wrong factual findings or that the hearing judge did not include enough facts

in his findings. Accordingly, to the extent that Petitioner’s exception with respect to MLRPC

8.4(d) relies on facts not determined by the hearing judge, Petitioner’s exception is overruled.

 Upon review of the hearing judge’s findings, this Court concludes that there is

insufficient evidence to establish a violation of MLRPC 8.4(d). “In general, an attorney

violates M[L]RPC 8.4(d) when his or her conduct impacts negatively the public’s perception

or efficacy of the courts or legal profession.” Attorney Grievance Comm’n v. Rand, 411 Md.

83, 96, 981 A.2d 1234, 1242 (2009). “An attorney’s conduct rises to this level if it is so

egregious that it has a negative impact on the profession as a whole, leaving a bad mark on

17
 (...continued)
together as opposed to having Ms. Coates stay there alone.

 25
all of us.” Attorney Grievance Comm’n v. Dore, 433 Md. 685, 709-10, 73 A.3d 161, 175

(2013). The hearing judge did not find that Respondent was attempting to misuse his role

as Ms. Coates’s attorney in order to develop a sexual relationship with her. The failure to

find an improper motive on the part of Mr. Merkle on the basis of the evidence presented was

not, in our view, clearly erroneous. Specifically, the hearing judge found that Respondent

and Ms. Coates communicated on Facebook and by email, but the comments between them

on Facebook ceased after they entered into an attorney-client relationship. The hearing judge

also found that Respondent invited Ms. Coates to use his furnished apartment as a place to

reside and for the reasons explained by Respondent. In addition, the hearing judge found that

Respondent offered to assist Ms. Coates in moving her personal belongings to a new

location, and that Respondent did physically help her in making the move. Finally, the

hearing judge accepted Mr. Merkle’s explanation for lying down on Ms. Coates’s bed. Judge

Dawson determined that Mr. Merkle made no inappropriate comments or gestures toward

Ms. Coates during this interaction. Although the interactions between Ms. Coates and

Respondent may have been outside of the traditional attorney-client relationship,

Respondent’s conduct did not rise to the level of a violation of MLRPC 8.4(d).

 The Preamble to the Maryland Lawyers’ Rules of Professional Conduct provides, in

relevant part, that “[m]any of a lawyer’s professional responsibilities are prescribed in the

Maryland Lawyers’ Rules of Professional Conduct, as well as substantive and procedural

law. However, a lawyer is also guided by personal conscience and the approbation of

 26
professional peers.” Comment [7]. As to the scope of these Rules, the Preamble also

provides in relevant part:

 [The Rules] are rules of reason. They should be interpreted with reference to
 the purposes of legal representation and of the law itself. Some of the Rules are
 imperatives, cast in the terms “shall” or “shall not.” These define proper
 conduct for purposes of professional discipline. Others, generally cast in the
 term “may,” are permissive and define areas under the Rules in which the
 lawyer has discretion to exercise professional judgment. No disciplinary action
 should be taken when the lawyer chooses not to act or acts within the bounds
 of such discretion.
Comment [14]. Accordingly, a lawyer has discretion to communicate with clients or

prospective clients through social media. Likewise, assisting or offering to assist a client or

prospective client in obtaining shelter or in moving from one residence to another is not per

se violative of the Maryland Lawyers’ Rules of Professional Conduct. Whether or not the

attorney violates the Rules of Professional Responsibility will depend upon the facts and

circumstances of each case. When a lawyer, in the exercise of discretion, involves him or

herself in conduct that is unnecessary to the attorney-client relationship or exceeds the

bounds of the attorney-client relationship, however, he or she runs the risk that his or her

exercise of professional judgment may be found to be both unreasonable and subject to the

disciplinary process.18

18
 To be sure, we do not suggest that social networking sites such as Facebook ought to
be avoided by attorneys outright. Indeed, attorneys may find them useful as networking
tools. Attorneys should exercise caution and be guided by professionalism when contacting
clients or prospective clients through the internet, however, recognizing that any
communication is both permanent and public.

 27
 We are unpersuaded by Bar Counsel’s reference to Attorney Grievance Comm’n v.

Goldsborough, 330 Md. 342, 348, 624 A.2d 503, 505 (1993)–in which an attorney, among

other things, pulled his client “across his knee, and . . . spanked her lightly several times,”

after calling her a “bad girl”–finding the case wholly distinguishable.19 Nor is this Court

convinced that Attorney Grievance Comm’n v. Hall, 408 Md. 306, 330-32, 969 A.2d 953,

967-68 (2009) (attorney found to be in violation of MLRPC 8.4(d) for having a sexual

relationship with his emotionally fragile client during his representation of her in an

employment discrimination suit), is pertinent. In the present case, Bar Counsel did not

establish that Mr. Merkle and Ms. Coates had a sexual relationship or that Mr. Merkle

attempted to establish one. On the basis of the record before us, we are unable to conclude

that Respondent’s conduct evinced even a motive to engage in conduct similar to the

attorneys in Goldsborough or Hall.

 III. Conclusion

 We conclude, based on the record before us, that Respondent’s conduct, as determined

by the hearing court, did not violate MLRPC 7.3 or 8.4. Therefore, the Petition for Remedial

or Disciplinary Action is dismissed. See Attorney Grievance Comm’n v. Rand, 429 Md. 674,

19
 The attorney’s conduct in Goldsborough far exceeded the bounds of decency. Indeed,
central to Bar Counsel’s complaint in that matter was (1) the attorney’s spanking of a client
on multiple occasions, (2) his spanking and attempt to kiss a second female client, and (3)
his repeated, and sometimes bare buttocks, spanking of a seventeen year-old assistant for
making typographical errors. 330 Md. at 347-49, 624 A.2d at 505-06.

 28
57 A.3d 976 (2012); Attorney Grievance Comm’n v. Link, 380 Md. 405, 844 A.2d 1197

(2004); cf. Attorney Grievance Comm’n v. Stolarz, 379 Md. 387, 842 A.2d 42 (2004).

 IT IS SO ORDERED.

 29
Circuit Court for Baltimore County
Case No. CAE13-15574

Argued: October 6, 2014
 IN THE COURT OF APPEALS

 OF MARYLAND

 Misc. Docket AG No. 17

 September Term, 2013
 ______________________________________

 ATTORNEY GRIEVANCE COMMISSION
 OF MARYLAND

 v.

 PATRICK GUY SAMUEL MARIE MERKLE
 ______________________________________

 Barbera, C.J.
 Harrell
 Battaglia
 Greene
 Adkins
 McDonald
 Watts,

 JJ.
 ______________________________________

 Dissenting Opinion by Watts, J.,
 which Harrell and Battaglia, JJ., join
 ______________________________________

 Filed: November 24, 2014
 Respectfully, I dissent. This is a worrisome attorney discipline proceeding against

a lawyer who allegedly engaged in conduct that was prejudicial to the administration of

justice. Specifically, serious allegations were made against Patrick Guy Samuel Marie

Merkle (“Merkle”), Respondent, by his former client, Sheila Coates-Black (“Coates-

Black”), who was allegedly a vulnerable person in an emotionally abusive relationship with

her husband when Merkle represented her.

 At its core, this attorney discipline proceeding illustrates an all-too-important point.

Women, and members of the public in general, routinely turn to lawyers when they are

vulnerable—e.g., during divorce, child custody, and criminal proceedings and so forth.

When a woman—or any person, for that matter—raises significant allegations of improper

conduct against a lawyer, the person expects that the allegations will be resolved and that

specific and detailed findings of fact will be made to enable this Court to determine whether

the lawyer violated the Maryland Lawyers’ Rules of Professional Conduct (“MLRPC”),

and, if so, the appropriate sanction.

 (A) Coates-Black’s Vulnerability

 To begin, I would sustain the Commission’s exception to the hearing judge’s finding

that there was no evidence that Coates-Black was emotionally vulnerable when Merkle

represented her. Simply put, from my perspective, the hearing judge’s finding is clearly

erroneous.

 The record amply demonstrates that Merkle was well aware that Coates-Black was

in an abusive relationship and emotionally vulnerable when he represented her. On January

26, 2010, Merkle e-mailed Coates-Black, stating: “It is well time for you to be documenting
instances of emotional abuse. Date, time and manner.” On March 1, 2010, Coates-Black

e-mailed Merkle, stating: “I can []now longer deal with this mental and verbal abuse so I

am asking if I need[] to move out before some[]thing dreadful happen[s.]” And, at the

disciplinary hearing, Merkle testified that he was aware of the abusive situation, stating: “I

have a pretty good deal of experience somewhere on the order of [fifteen] cases involving

short[-]duration marriages with . . . violence, but [] Coates-Black, her violence is really

emotional violence, this back and forth stuff with the . . . temporary protective orders[.]”

Indeed, at the hearing, Merkle asked Coates-Black whether she had been “in an emotionally

abusive arrangement staying” with her husband, and Coates-Black replied: “Sometimes.”

Coates-Black also testified that she sought protective orders against her husband because

she had been “afraid” and because her husband had “bec[o]me so abusive.”1

 Yet, the hearing judge failed to address or make any findings of fact concerning

Coates-Black’s vulnerability other than to state: “Bar Counsel did not introduce any

evidence of Coates[-Black]’s mental state at the hearing, yet argued in her closing that

Coates was a vulnerable individual [of] who[m Merkle] took advantage[.]” This

conclusory statement utterly fails to account for the evidence that leads to the inescapable

conclusion that Coates-Black was, indeed, vulnerable. Based on all of the above evidence,

the hearing judge clearly erred in finding that there was no evidence that Coates-Black was

emotionally vulnerable when Merkle represented her.

 1
 At oral argument, Merkle stated that Coates-Black was experiencing “turmoil . . .
in her marriage” when he represented her.

 -2-
 (B) Lack of Findings of Fact

 Next, pursuant to Maryland Rule 16-759(c)(6),2 I would remand for additional fact-

finding concerning the alleged violation of MLRPC 8.4(d) (Conduct that is Prejudicial to

the Administration of Justice).3 Specifically, evidence offered by Bar Counsel indicated

that Merkle, among other things: (1) “commented on” Coates-Black’s attire while she was

visiting him in his office, and later described Coates-Black’s attire as having a “plunging

neckline” and being “quite revealing from the middle”; (2) sat on the same side of his desk

as Coates-Black while she was visiting him in his office and asked her to rub his shoulders,

prompting Coates-Black to decline and move to the opposite side of Merkle’s desk “to

keep [him] away from” her; (3) attempted to visit Coates-Black at her apartment after 10:00

p.m.; and (4) offered, on multiple occasions, to let Coates-Black use an apartment in a

building that he owned.4 Despite this evidence, and despite the serious allegations of

improper conduct that Coates-Black raised at the hearing, the hearing judge inexplicably

 2
 Rule 16-759(c)(6) provides that this Court “may order . . . a remand” in an attorney
discipline proceeding.
 3
 I take no contrary position to the Majority’s conclusions that Merkle did not violate
MLRPC 1.2 (Scope of Representation and Allocation of Authority Between Client and
Lawyer), 1.6 (Confidentiality of Information), or 7.3(a) (Direct Contact with Prospective
Clients).
 4
 The hearing judge found that: (1) shortly after their initial meeting in October 2008,
Merkle e-mailed Coates-Black with information about a jazz club, stating: “[W]hen I heard
that you went to a jazz club, this is what I thought of. I have been on the emailing list for
Shore Jazz for years and keep them in mind”; (2) in 2009, Merkle and Coates-Black became
friends on Facebook, and Merkle commented as follows on a photograph that Coates-Black
had posted: “Maybe that’s me on [Coates-Black’s daughter]’s tattoo!” The hearing judge
made no further findings of facts concerning these two matters. The record reveals that, in
the e-mail, Merkle stated that he kept Shore Jazz “in mind for beach dates[.]”

 -3-
failed to make any findings of fact whatsoever concerning these matters. The allegations

were well-detailed and described Merkle’s alleged improper and unseemly conduct toward

Coates-Black, yet the hearing judge did not address or even mention them. Equally

troubling is that, at oral argument, Merkle implied that he acted as a father figure to Coates-

Black.5 The potential that Merkle abused his position of power with a client who was in

an emotionally vulnerable condition is troubling and cause for concern, to say the least.

Yet, for unexplained reasons, the hearing judge failed to make any findings of fact

concerning these matters.6

 In sum, despite a myriad of evidence concerning Merkle’s alleged improper conduct

toward Coates-Black, the hearing judge oddly failed to make any findings of fact

concerning Merkle’s conduct and conclude whether the conduct was a violation of MLRPC

8.4(d). To remedy this obvious defect, I would remand this attorney discipline proceeding

to the hearing judge with instructions to make findings of fact as to Merkle’s alleged

improper behavior toward Coates-Black and conclude whether such behavior was a

violation of MLRPC 8.4(d). Again, women—and all persons who are represented by

lawyers—expect that allegations concerning the lawyers’ misconduct will be adequately

resolved by hearing judges in attorney discipline proceedings and, ultimately, addressed

 5
 Specifically, Merkle stated: “I have a lot of dialogue with a lot of people where I’m
kinda like the dad. And [] Coates[-Black] was one of these people.”
 6
 In one instance, after summarizing an incident in which Merkle accepted
medication from Coates-Black and was lying on her bed, the hearing judge found that
Merkle “did not make any inappropriate comments or gestures towards [] Coates[-Black].”
This conclusory statement regarding one instance of alleged misconduct does not suffice
to address the multiple allegations of Merkle’s improper conduct and the evidence offered
at the hearing.

 -4-
by this Court. Respectfully, I dissent.

 Judge Harrell and Judge Battaglia have authorized me to state that they join in this

opinion.

 -5-